SAUNDERS v. LUCKENBACH CO., Inc.

(District Court, S. D. of New York. February 3, 1919.)

No. 65-99.

1. SEAMEN ⬅2—RIGHT OF INJURED SEAMEN TO CARE AND MAINTENANCE.

A steamship in the transatlantic merchant service during the war did not cease to be a merchantman, nor its crew merchant seamen, with the right to maintenance and care in case of injury, because the vessel carried an armament of two guns, manned by a naval crew, for protection against submarines.

2. SEAMEN ⬅11—INJURED SEAMAN'S RIGHT TO CARE AND MAINTENANCE.

Decree affirmed, holding that the fact that a seaman received fifty per cent. additional wages as a "war risk bonus" did not deprive him of the right to maintenance and care for a reasonable time after termination of the voyage, while being treated for an injury received during a submarine attack on the vessel.

In Admiralty. Suit by Drew B. Saunders against the Luckenbach Company, Incorporated. Decree for libelant.

Decree affirmed 262 Fed. 849, —— C. C. A. ——.

Silas B. Axtell, of New York City, for libelant.
Peter S. Carter, of New York City, for respondent.

HOUGH, Circuit Judge. The material facts seem to be as follows: Libelant became first assistant engineer on an American steamship owned by respondent. The vessel was engaged in the merchant service; her crew, including libelant, was shipped in the usual manner before the commissioner, and so far as the contract between the parties hereto (and therefore between libelant and his ship) is concerned, as expressed by writings in evidence, there was nothing about it out of the common, except the rate of wage.

As to this, it was agreed on the face of the articles that, in addition to wages, libelant and his mates were to receive a "war risk bonus of 50 per cent." of their wages, and also that both wages and bonus should, in the event of loss of the vessel, continue to be paid until the crews had again reached the United States, provided that such return was not delayed beyond two calendar months.

[1] On the voyage to France the vessel was attacked by a German submarine, but the steamship was armed with two guns, manned (a fact of which judicial notice is taken) by a naval gun crew. A running fight ensued, lasting for several hours, and terminated only by the arrival on the scene of the U. S. S. Nicholson, whereupon the attacking German vessel submerged and disappeared. It does not appear that the arming of the steamship was otherwise than voluntary on the part of her owners. My inference from the evidence is that quite properly and lawfully, but for the sake of gain, the ship reverted to the habits of merchantmen historically known as existing well into the last century; i. e., the habit of going armed in order to resist attempted capture by anything but superior force.

One may assume that the owners were entirely ignorant that in arming their vessel they were reverting to the custom of years ago, but I think it must follow from this fact that the steamship did not cease to be a merchantman, and her crew did not cease to be merchant seamen, because she carried an armament of two guns and a detachment of naval gunners.

The libelant was on duty in the engine room during this engagement. A shell from the submarine struck some portion of the superstructure, or possibly the machinery, and pieces of metal (whether shell fragments, shrapnel, or pieces of the ship's structure is not of importance) descended into the engine room and struck libelant.

From the evidence it is plain that he received a slight wound in the foot and another in the calf of one leg. He says that a rib or two were broken, and pieces of shrapnel struck him in the back. He undoubtedly shows evidence at present of having had at least one rib broken at some time, and he has two small discolorations on his back not far from his spine. The testimony leaves me in great doubt as to whether these present discolorations have any relation to the attack by the submarine, or whether he did have any rib broken at that time. My doubt on the latter point is that it is not possible that he should have done as much work as he did for days after the fight if his rib or ribs had been actually fractured.

I find the fact to be that neither Saunders nor his fellow officers considered at the time that he was much hurt. The surgeon of the Nicholson came aboard, attended to his foot, looked him over, and left him evidently as fit to keep a "throttle watch," which seems to be an engine room term for sitting down in the engine room and giving orders without moving about. His vessel went to Havre, and he was seen by a French shore doctor, who seems to have been satisfied with the way he was getting on. She then went to a Welsh port and coaled, thence to Queenstown, and so on back to New York, where the crew was paid off. During all this period Saunders continued to do partial duty, but was not looked upon as well by his mates. He made no complaint on arrival at New York, did not ask to go to the hospital, but repaired to a lodging house in this city, where he says he has kept a room, present or absent, for the last two years, and employed a doctor of his own. He did no work for four months, and since that time has been little at sea, but has, he says, with difficulty performed mostly harbor jobs, and not even that continuously. He says he is much better than when he left respondent's ship, but his appearance, method of speech, and general demeanor is entirely consonant with the medical testimony from both sides of this case that he still is in an excited and nerve-shaken condition. I find no difficulty in agreeing with one of the testifying physicians that in common parlance the man is hysterical.

The testimony of the chief engineer is that "he appeared to be an A-1 man in every way" before the attack of the submarine. I find that he did not receive during said attack any wound or laceration of tissue that in the least accounts either for his present condition or for his

history during the year and a quarter that has elapsed since the submarine attack. Under a good physical exterior, beneath the physique of a vigorous man of middle age, I have no doubt that this libelant concealed a nervous system or a vital connection between nerve and brain of an inferior character, and that the excitement and shock of battle, plus slight physical injuries, have used him up in a way that a better organized man would never experience.

But just as some men have bones that break more easily than others, or have skulls so thin that they may be killed by a blow that would not hurt most of us, so there are men whose systems are such that they receive injury through the brain and nervous system in ways that are mysterious. I think this libelant is such an unfortunate. But he worked no deception; he was guilty of no wrongdoing himself. He appeared to be perfectly fit to go to sea; however annoying (to use a somewhat frivolous word in such a connection) it may be to have on board a vessel in wartime a man who is so easily hurt as Saunders, I do not think that he is thereby put outside the pale of that measure of protection which every ship owes to the seamen on board of it for all hurt, injury, or disaster not caused by their own willful wrongdoing.

In my opinion everything was done for Saunders that could have been done. Surgery could not help his defective nervous system. He was not and is not suffering from what is commonly called (by laymen) "shell shock"; yet he has suffered and is suffering from the results of the explosion of a shell, and he was therefore entitled to a reasonable period of care and maintenance after the voyage on which he was hurt terminated.

[2] I think this is the result of our local cases on this point, especially The Bouker No. 2, 241 Fed. 831, 154 C. C. A. 533, and cases cited, unless one or all of the following matters change the law: First, he was injured in a fight; second, he and all the other members of the crew were covered by war risk insurance under the recent statute; and, third, he was getting from respondent 50 per cent. additional to a high wage as a "war risk," and he was injured by reason of the war risk that he was thus paid for taking. So far as the governmental insurance was concerned, the policy did not cover the kind of injury that Saunders received, and I fail to see how a man can be said to be affected as to a given risk by insurance as to another and entirely different risk. Therefore I think there is nothing in this defense. The other two defenses are really the same, and present the point that the dangers of crossing the ocean were perfectly well known in October, 1917; that Saunders knew them, and took his chances for pay, and therefore he ought not to ask anything from his shipowners, because he took no hurt, except one of which he had assumed the risk.

With considerable doubt, and quite conscious that I may be influenced by very deep-rooted views of the extent and nature of sea perils, and a firm belief that the union between crew and ship ought always to be maintained with loyalty on both sides, and should

extend on the one hand to the care of the ship as "long as two planks hang together," and on the other hand to the care of the seamen in every way naturally arising out of their dangerous and honorable employment, I am of opinion that Saunders and his mates engaged to assist the owners of the steamship in an adventure full of peril, and yet it was all sea peril; war had only increased the dangers of the seas, not changed their kind. Even to-day almost every deep-sea bill of lading contains the exception against pirates, robbers, enemies, and capture; they are among the oldest perils of the merchantmen. To be sure, the seamen received high wages; but the shipowners, on the other hand, received high freights. The nature of the engagement between ship and crew remained the same. Only the probabilities of hurt were increased, but neither by express contract nor by any provision of law is the duty of care and maintenance taken away from the ship. Indeed, I think it would require express statutory provision to relieve a ship of this obligation.

I am not aware of any authority on this point, but to me it follows logically, as well as humanely, from the accepted and well-established doctrine. Thus I think libelant is entitled to a decree. What he needed was rest; possibly with better advice he would have gotten along very much faster; but he felt himself sufficiently rested and recuperated to go to work in four months. From his own statement, I think the very moderate cost of his living was not to exceed $80 a month. The evidence as to his doctor's bill and medicament charges is very vague. I find it impossible to accept the estimate of $100 for what libelant calls "medicine." On the whole, I think that for doctors and medicines $50 is as much as the testimony will warrant. The cost of maintenance is much higher than when libelant in The Bouker No. 2 fell ill; of this cognizance is taken. The evidence only affords an opportunity to estimate. My estimate is that $300 would be a fair price for a four months' rest.

For that amount and costs libelant may have decree.