## THE EASTERN DAWN.

### OIDERMAN v. UNITED STATES.

District Court, E. D. Pennsylvania.
April 4, 1928.

No. 25 of 1925.

1. Seamen ⊚⟶29(5)—Evidence held insufficient to show that injury to seaman was due to negligence of master in handling of vessel.

Where libelant, who was boatswain on a steamship crossing the Atlantic, was injured while engaged with others in lashing a lifeboat during a severe gale, testimony of two seamen, who were not navigators, were not on the vessel, and did not know the conditions, that the ship could have been headed more into the wind to give better protection to the men at work, *held* insufficient to establish negligence of the master.

2. Seamen ⊚⟶11(6)—Seaman injured on ship is entitled to cure and maintenance after discharge during disability.

Seaman injured in service of ship *held* entitled to recover additional cost of treatment and cure after his discharge.

In Admiralty. Suit by Karl Oiderman against the United States, as owner of steamship Eastern Dawn. Decree for libelant.

Carl G. Kirsch, of Philadelphia, Pa., for plaintiff.

George W. Coles, U. S. Atty., and Paul W. Knox, both of Philadelphia, Pa., for defendant.

THOMPSON, District Judge. The steamship Eastern Dawn is owned and operated by the United States Shipping Board, and in November, 1924, was on a voyage from Philadelphia and New York to Rotterdam. The libelant, Karl Oiderman, had shipped at boatswain for an indefinite period. On November 23, while on her voyage, the steamship encountered a southeast gale of hurricane force with low barometer, and was slowed down to about 3½ knots, and held on an easterly course in a heavy confused sea with sufficient steerageway to keep her up to the wind. Storm oil was used on both bows of the vessel to break the force of the waves. At about 8 p. m. she shipped a heavy sea over the starboard bow, which, running along the deck, carried away two forward

ventilators, a part of the starboard bridge rail, and the chocks under the starboard lifeboat and workboat.

The chief officer, Mr. Kelly, was ordered to lash and secure the boats, as heavy seas were breaking over the main deck. A seaman called the boatswain, the libelant. The chief officer, the libelant, and a seaman proceeded to lash the starboard lifeboat in order that it would not swing on its davits and be washed away or do further damage. The chief officer and the libelant were on the inshore side between the lifeboat and the vegetable locker, a construction of about four feet in height on the deck, and the seaman was taking turns with the lashing around the davit.

While so engaged, a heavy sea broke over the starboard side with great force, submerging all three men, and the libelant was injured while trying to support himself by holding onto the side of the boat, sustaining a fracture of the outer ankle of the left foot. He was ordered to quit work, and whatever remedies were available on the vessel were used until the Eastern Dawn arrived at Rotterdam about ten days later. Meanwhile he had been relieved of all duties except such as he voluntarily performed.

Upon arrival at Rotterdam, he was taken to a hospital, and a plaster cast put upon his foot. The master offered to have him stay in the hospital, but he declined and went back to the ship. Upon arrival at New York, he was taken to the Marine Hospital, and the master offered to allow him to stay in New York, but he declined, and stayed on the boat until it arrived in Philadelphia, and he was paid off on January 15, 1925. He was then sent to St. Agnes Hospital to have an X-ray taken of his foot, and he continued taking treatment under direction of the Public Health Service until about the end of May.

He then worked at painting railroad bridges for eight days but quit because of pain in his foot. Three weeks later he obtained work as a rigger, but after two weeks at that employment again quit because of pain in his foot. On August 15 he obtained carpenter work on the Delaware river bridge and worked at that job for three months. At the time of the hearing on February 17, 1928, he still complained that his foot was hurting him. Examination by a physician, to whom he was referred by the Public Health Service, showed that the fracture had knitted, that the foot was in good condition with no formation of callous, that the motion of the foot shortly before the trial showed no objective symptoms which indicated interfer-

ence with any work in which he might be engaged, and that at the time of the trial his left ankle was in as good condition as his right ankle.

[1] The libelant claims damages by reason of the respondent "negligently failing to operate the vessel in a manner best calculated to promote and insure the health and safety of the members of the crew and in negligently failing to observe the proper precautions in operating and directing the ship."

Under that specification, it is contended that the master, upon requiring the libelant to assist in lashing the lifeboat, should have seen to it that the course of the vessel was so changed as to bring her at least one point closer into the wind, thereby preventing the seas from coming over the starboard side where the libelant was required to work and thus avoiding injury to him while he was engaged in the work of saving the lifeboat from being carried away or causing other injury to the ship.

The burden of proving negligence is upon the libelant. In attempting to sustain the burden, he called as witnesses two seamen who were not on the Eastern Dawn when the libelant was injured, and who testified that, in a southeasterly storm, with the wind southeast, the master could with safety have brought the vessel from her easterly course four points further into the wind, and that that would have caused the seas to break over the port side of the ship and thus have given the libelant a safe place to work on the starboard side. That testimony is not sufficient to satisfy me that there was want of due care on the part of the master. The witnesses were not experts in navigation. They knew nothing about the conditions present except the direction of the wind and the storm and the course of the ship. In order to find that the master could have safely changed the course of the vessel during the lashing of the lifeboats, and to reach the conclusion that he was negligent in not doing so, all the facts and circumstances in connection with the situation would have to be taken into consideration. I cannot find the master guilty of negligence in that respect upon the mere opinion evidence of two witnesses who are not expert navigators, and who, even if they were such, did not have all the surrounding circumstances before them.

The first care of the master is the safety of his ship and crew. In case of danger of loss of the ship, the safety of the crew depends upon having the lifeboats ready and in condition for the crew to leave. It was the duty of the boatswain to see that the lifeboats were properly secured, and, in securing the lifeboats from being carried away in the storm, he assumed the risks incident to his employment. The evidence does not convince me that the master failed to use his best judgment in taking into consideration the safety of his ship and crew when he kept the vessel headed as she was while the boatswain was engaged in his perilous duty of lashing the lifeboat.

If recovery were based solely upon the charge of negligence, the libel should be dismissed.

[2] While the libelant has failed to make out a case of negligence, he is entitled to cure and to maintenance during the period of his disability caused by injury in the performance of his duty. The Osceola, 189 U. S. 158, 23 S. Ct. 483, 47 L. Ed. 760.

The respondent, through the Public Health Service, provided the libelant with means of cure, so far as he saw fit to avail himself of care and treatment of his injured ankle through the Public Health Service. He was paid off on January 15, 1925, and, except for a period of about three weeks, was unable to support himself by work again until about August 15. So far as the contrary is shown by the evidence, he has been maintaining himself by working since that time. The period during which the respondent is liable for his maintenance and cure may be estimated at twenty-seven weeks. His living expenses for room, lodging, laundry, and carfare expended in undergoing treatment amounted, according to his uncontradicted testimony, to $14.80 per week; adding to this $5 for X-raying his foot and $5 for a physician's fee, $3 for Epsom salts, his total outlay proven was $412.60. To that amount may be added interest at 4 per cent. from August 15, 1925.

A decree will therefore be entered in favor of the libelant in the sum of $456.06.