## FARRELL *v.* UNITED STATES ET AL.

No. 267. Argued January 14, 1949.—Decided April 4, 1949.

*Silas Blake Axtell* and *Myron Scott* argued the cause for petitioner. With them on the brief was *G. Lester W. Curry.*

*Newell A. Clapp* argued the cause for the United States, respondent. With him on the brief were *Solicitor Gen-*

*eral Perlman, Assistant Attorney General Morison, Samuel D. Slade* and *Alvin O. West.*

Mr. Justice Jackson delivered the opinion of the Court.

Petitioner, a seaman, brought suit in admiralty to recover damages under the Jones Act, 41 Stat. 1007, 46 U. S. C. § 688, and maintenance, cure and wages under maritime law. The issue of negligence was decided against him by both courts below and the claim is abandoned here. Petition for certiorari to review other issues was granted. 335 U. S. 869.

## I. Maintenance and Cure.

The facts which occasion maintenance and cure for this seaman are not in dispute. The claimant, 22 years of age and in good health, was a member of the Merchant Marine. He was in the service of the S. S. *James E. Haviland,* a merchant vessel owned and operated by the United States as a cargo and troop ship. On February 5, 1944, she was docked at Palermo, Sicily, and Farrell was granted shore leave which required his return to the ship by 6 p. m. of the same day. He overstayed his leave and about eight o'clock began, in rain and darkness, to make his way to the ship. He became lost and was misdirected to the wrong gate, by which he entered the shore-front area about a mile from where the ship lay moored. The area generally was blacked out but petitioner's companion, forty or fifty feet away, saw him fall over a guard chain into a drydock which was lighted sufficiently for night work then in progress. Farrell was grievously injured.

He was treated without expense to himself in various government hospitals until June 30, 1944, when he was

discharged at Norfolk, Virginia, as completely disabled. He is totally and permanently blind and suffers post-traumatic convulsions which probably will become more frequent and are without possibility of further cure. From time to time he will require some medical care to ease attacks of headaches and epileptic convulsions. The court below concluded that the duty of a shipowner to furnish maintenance and cure does not extend beyond the time when the maximum cure possible has been effected. Petitioner contends that he is entitled to maintenance as long as he is disabled, which in this case is for life.

Admittedly there is no authority in any statute or American admiralty decisions for the proposition that he is entitled to maintenance for life. But an argument is based upon the ancient authority of Cleirac, *Jugmens d'Oleron,* Arts. 6 and 7 and notes by Cleirac; *Consolato del Mare,* cc. 182, 137; 2 Pard Coll. Mar. 152; to which American authorities have paid considerable respect. See Story, Circuit Justice, in *Reed* v. *Canfield,* Fed. Cas. No. 11,641, p. 429. A translation of the note relied upon reads:

> "If in defending himself, or fighting against an enemy or corsairs, a mariner is maimed, or disabled to serve on board a ship for the rest of his life, besides the charge of his cure, he shall be maintained as long as he lives at the cost of the ship and cargo. Vide the *Hanseatic* law, art. 35." 1 Peters' Admiralty Decisions (1807), Appendix, p. xv.

Article 35 of the Laws of the Hanse Towns referred to reads:

> "ART. XXXV. The seamen are obliged to defend their ship against rovers, on pain of losing their wages; and if they are wounded, they shall be healed and cured at the general charge of the concerned in

a common average. If anyone of them is maimed and disabled, he shall be maintained as long as he lives by a like average." *Ibid.*, p. civ.

We need not elaborate upon the meanings or weight to be given to these medieval pronouncements of maritime law. As they show, they were written when pirates were not operatic characters but were real-life perils of the sea. When they bore down on a ship, all was lost unless the seaman would hazard life and limb in desperate defense. If they saved the ship and cargo, it was something in the nature of salvage and for their sacrifice in the effort a contribution on principles of average may have been justly due. Perhaps more than humanitarian considerations, inducement to stand by the ship generated the doctrine that saving the ship and her cargo from pirates entitles the seaman to lifelong maintenance if he is disabled in the struggle.

But construe the old-time law with what liberality we will, it cannot be made to cover the facts of this case. This ship was not beset but was snug at berth in a harbor that had capitulated to the United States and her allied forces six months before. No sea rovers, pirates or corsairs appeared to have menaced her. It is true that the ship was engaged in warlike operations and was a legitimate target for enemy aircraft or naval vessels, which made her service a war risk, but at that time and place no enemy attack was in progress or imminent. Even if we pass all this and assume the ship always to have been in potential danger and in need of defense, this seaman at the time of his injury had taken leave of her and he is in no position to claim that he was a sacrifice to her salvation. Far from helping to man the ship at the moment, he was unable to find her; he was lost ashore and not able adequately to take care of himself. However patriotic his motive in enlisting in the service and

however ready he may have been to risk himself for his country, we can find no rational basis for awarding lifetime maintenance against the ship on the theory that he was wounded or maimed while defending her against enemies.

It is claimed, however, even if the basis for a lifetime award does not exist, that he is entitled to maintenance and cure beyond the period allowed by the courts below. This is based largely upon statements in the opinion of the Court in *Calmar Steamship Corp.* v. *Taylor,* 303 U. S. 525. There the question as stated by the Court was whether the duty of a shipowner to provide maintenance and cure for a seaman falling ill of an incurable disease while in its employ, extends to the payment of a lump-sum award sufficient to defray the cost of maintenance and cure for the remainder of his life. The Court laid aside cases where incapacity is caused by the employment and said, "We can find no basis for saying that, if the disease proves to be incurable, the duty extends beyond a fair time after the voyage in which to effect such improvement in the seaman's condition as reasonably may be expected to result from nursing, care, and medical treatment. This would satisfy such demands of policy as underlie the imposition of the obligation. Beyond this we think there is no duty, at least where the illness is not caused by the seaman's service."

It is claimed that when the Court reserved or disclaimed any judgment as to cases where the incapacity is caused "by the employment" or "by the seaman's service" it recognized or created such cases as a separate class for a different measure of maintenance and cure. We think no such distinction exists or was premised in the *Calmar* case. In *Aguilar* v. *Standard Oil Co.,* 318 U. S. 724, the Court pointed out that logically and historically the duty of maintenance and cure derives from

a seaman's dependence on his ship, not from his individual deserts, and arises from his disability, not from anyone's fault. We there refused to look to the personal nature of the seaman's activity at the moment of injury to determine his right to award. Aside from gross misconduct or insubordination, what the seaman is doing and why and how he sustains injury does not affect his right to maintenance and cure, however decisive it may be as to claims for indemnity or for damages for negligence. He must, of course, at the time be "in the service of the ship," by which is meant that he must be generally answerable to its call to duty rather than actually in performance of routine tasks or specific orders.

It has been the merit of the seaman's right to maintenance and cure that it is so inclusive as to be relatively simple, and can be understood and administered without technical considerations. It has few exceptions or conditions to stir contentions, cause delays, and invite litigations. The seaman could forfeit the right only by conduct whose wrongful quality even simple men of the calling would recognize—insubordination, disobedience to orders, and gross misconduct. On the other hand, the master knew he must maintain and care for even the erring and careless seaman, much as a parent would a child. For any purpose to introduce a graduation of rights and duties based on some relative proximity of the activity at time of injury to the "employment" or the "service of the ship," would alter the basis and be out of harmony with the spirit and function of the doctrine and would open the door to the litigiousness which has made the landman's remedy so often a promise to the ear to be broken to the hope.

Nor is it at all clear to us what this particular litigant could gain from introduction of the distinction for which contention is made. If we should concede that larger

measure of maintenance is due those whose injury is caused by the nature of their employment, it would seem farfetched to hold it applicable here. Claimant was disobedient to his orders and for his personal purposes overstayed his shore leave. His fall into a drydock that was sufficiently lighted for workmen to be carrying on repairs to a ship therein was due to no negligence but his own. These matters have not been invoked to forfeit or reduce his usual seaman's right, but it is difficult to see how such circumstances would warrant enlargement of it. We hold that he is entitled to the usual measure of maintenance and cure at the ship's expense, no less and no more, and turn to ascertainment of its bounds.

The law of the sea is in a peculiar sense an international 'law, but application of its specific rules depends upon acceptance by the United States. The problem of the sick or injured seaman has concerned every · maritime country and, in 1936, the General Conference of the International Labor Organization at Geneva submitted a draft convention to the United States and other states. It was ratified by the Senate and was proclaimed by the President as effective for the United States on October 29, 1939. 54 Stat. 1693. Article 4, paragraph 1, thereof, provides: "The shipowner shall be liable to defray the expense of medical care and maintenance until the sick or injured person has been cured, or until the sickness or incapacity has been declared of a permanent character."

While enactment of this general rule by Congress would seem controlling, it is not amiss to point out that the limitation thus imposed was in accordance with the understanding of those familiar with the laws of the sea and sympathetic with the seaman's problems.

The Department of Labor issued a summary of the Convention containing the following on this subject: "The shipowner is required to furnish medical care and

maintenance, including board and lodging, until the disabled person has been cured or the disability has been declared permanent." Robinson, *Admiralty*, p. 300.

Representatives of the organized seamen have recognized and advised Congress of this traditional limitation on maintenance and cure. When Congress has had under consideration substitution of a system of workmen's compensation on the principles of the Longshoremen's and Harbor Workers' Compensation Act, 44 Stat. 1424, as amended, 33 U. S. C. §§ 901–950, organized seamen, as we have heretofore noted, have steadfastly opposed the change. *Hust* v. *Moore-McCormack Lines*, 328 U. S. 707, 715. In doing so the legal representative of one maritime union advised the Committee on Merchant Marine of the House of Representatives that maintenance extended during "(a) the period that a seaman receives treatment at a hospital either as an in-patient or an out-patient; and (b) during a period of convalescence, and until the maximum cure is obtained."[1] Another representative, after defining it to include hospitalization, said, "In addition a seaman is entitled to recover maintenance while outside of the hospital until his physical condition becomes fixed."[2]

That the duty of the ship to maintain and care for the seaman after the end of the voyage only until he was so far cured as possible, seems to have been the doctrine of the American admiralty courts prior to the adoption of the Convention by Congress,[3] despite occasional ambiguity of language or reservation as to possible

---

[1] Hearings before the House Committee on Merchant Marine and Fisheries, 76th Cong., 1st Sess., on H. R. 6726 and H. R. 6881, p. 83.

[2] *Id.*, p. 131.

[3] See, for example, *The Wensleydale*, 41 F. 829; *The Bouker No. 2*, 241 F. 831; *Skolar* v. *Lehigh Valley R. Co.*, 60 F. 2d 893; *The Point Fermin*, 70 F. 2d 602.

situations not before the court. It has been the rule of admiralty courts since the Convention.[4]

Maintenance and cure is not the only recourse of the injured seaman. In an appropriate case he may obtain indemnity or compensation for injury due to negligence or unseaworthiness and may recover, by trial before court and jury, damages for partial or total disability. But maintenance and cure is more certain if more limited in its benefits. It does not hold a ship to permanent liability for a pension, neither does it give a lump-sum payment to offset disability based on some conception of expectancy of life. Indeed the custom of providing maintenance and cure in kind and concurrently with its need has had the advantage of removing its benefits from danger of being wasted by the proverbial improvidence of its beneficiaries. The Government does not contend that if Farrell receives future treatment of a curative nature he may not recover in a new proceeding the amount expended for such treatment and for maintenance while receiving it.

The need of this seaman for permanent help is great and his plight most unfortunate. But as the evidence has afforded no basis for supplying that need by finding negligence, neither does the case afford a basis for distortion of the doctrine of maintenance and cure. This seaman was in the service of the United States and extraordinary measures of relief while not impossible are not properly addressed to the courts.

## II. WAGES.

The two courts below have held the petitioner entitled to wages until the completion of the voyage at the port

---

[4] See, for example, *Lindgren* v. *Shepard S. S. Co.*, 108 F. 2d 806; *The Josephine & Mary*, 120 F. 2d 459; *Luksich* v. *Misetich*, 140 F. 2d 812.

of New York on March 28, 1944. The petitioner contends that he has a right to wages for twelve months from December 16, 1943, the date he joined the vessel. The articles of the *Haviland,* signed by petitioner, were on a printed form which left a vacant space subject to the following footnote: "Here the voyage is to be described, and the places named at which the ship is to touch; or, if that cannot be done, the general nature and probable length of the voyage is to be stated, and the port or country at which the voyage is to terminate." The *Haviland's* articles, for security reasons during the war, did not describe the voyage in such terms but provided, "from the Port of Philadelphia, to A point in the Atlantic Ocean to the eastward of Phila. and thence to such ports and places in any part of the world as the Master may direct or as may be ordered or directed by the United States Government or any department, commission or agency thereof . . . and back to a final port of discharge in the United States, for a term of time not exceeding 12 (Twelve) calendar months." It is not questioned that the general custom in ships, other than the coastwise trade, is to sign on for a voyage rather than for a fixed period. But it is contended that the last clause of this contract obligated the petitioner to serve for twelve calendar months, irrespective of the termination of the voyage, and therefore gave him the right to wages for a similar period. The contract is not an uncommon form and complied with war-time requirements as to voyage contracts.[5] We think, in the light of the custom of the industry and the condition of the times, there is nothing ambiguous about it and that it obligated the petitioner only for the voyage on which the ship was engaged when he signed on and that, when it terminated at a port of

[5] 7 Fed. Reg. 2477.

discharge in the United States, he could not have been required to reimbark for a second voyage. The twelve-month period appears as a limitation upon the duration of the voyage and not as a stated period of employment. We think the court below made no error in determining the wages.

For the reasons set forth, the judgment is

*Affirmed.*

MR. JUSTICE DOUGLAS, with whom MR. JUSTICE BLACK, MR. JUSTICE MURPHY and MR. JUSTICE RUTLEDGE concur, dissenting.

I. *Wages.*—The articles bound Farrell to a voyage on the vessel which was en route to "a point in the Atlantic Ocean to the eastward of Phila. and thence to such ports and places in any part of the world as the Master may direct or as may be ordered or directed by the United States Government or any department, commission or agency thereof . . . and back to a final port of discharge in the United States, for a term of time not exceeding 12 (Twelve) calendar months." If this were a coast-wise voyage, there would be little question that Farrell could recover his wages for the entire twelve-month period. See *Enochasson* v. *Freeport Sulphur Co.,* 7 F. 2d 675; *Jones* v. *Waterman S. S. Corp.,* 155 F. 2d 992, 996. I agree with Judge Kirkpatrick that the principle of those cases is likewise applicable to foreign voyages. *Shields* v. *United States,* 73 F. Supp. 862, 866. Any difference is not apparent. In each the seaman binds himself for the period. The obligations to pay wages should be coterminous with that responsibility. *Enochasson* v. *Freeport Sulphur Co., supra.* The number of voyages made is therefore immaterial. It is the extent of the voyage that could be demanded that is controlling.

II. *Maintenance and Cure.—Calmar S. S. Corp.* v. *Taylor,* 303 U. S. 525, involved maintenance and cure [1] for an incurable disease which manifested itself during the seaman's employment but was not caused by it. The Court held that the shipowner's liability ended when the seaman was cured as far as possible, reserving the question whether a different rule would apply if the incapacity arose from the employment. P. 530. The question reserved is now presented, for an injury received on returning to a ship from shore leave is plainly incurred in the service. *Aguilar* v. *Standard Oil Co.,* 318 U. S. 724; *Reed* v. *Canfield,* Fed. Cas. No. 11,641. Justice Story was of the view that the ship remained liable until the cure was completed. *Reed* v. *Canfield, supra.* That was in 1832. Intervening decisions in the lower courts qualified that view. It was held that the right to maintenance and cure extended to a reasonable time beyond the end of the voyage.[2] The problem of what was a reasonable time remained. The test adopted by the Court is that it extends through the period when the maximum cure within the reach of medical science has been achieved.

But that test is not sufficiently discriminating.

Even though a maximum cure has been effected, two entirely different states of being may result when the injured man is left totally disabled.

(1) He may be totally disabled but no longer in need of medical aid to care for the condition created by the injury nor without means of providing maintenance. That is not the present case, at least so far as medical care is concerned. And we need not determine what rights to maintenance and cure one so situated has.

---

[1] Maintenance includes food and lodging; and cure means care. *The Bouker No. 2,* 241 F. 831, 835.

[2] *The Bouker No. 2, supra; The Mars,* 149 F. 729; *The Eastern Dawn,* 25 F. 2d 322; *The Troy,* 121 F. 901; *Geistlinger* v. *International Mercantile Marine Co.,* 295 F. 176.

(2) One injured in the service of a ship may not only be permanently disabled after reaching the point of maximum cure. He may also be in need of future medical aid to sustain that condition and be without means of maintenance. These needs may extend to end of life. That is the present case, at least so far as medical care is concerned.[3] In this situation payments to give continuing needed care of wounds have been allowed, even though a maximum cure has been effected. *The Josephine & Mary,* 120 F. 2d 459, 462, 464. Cf. *Saunders* v. *Luckenbach Co.,* 262 F. 845, 847.

In the present case an award for maintenance and cure to cover a six-month period after discharge from the hospital was allowed. Nevertheless even though Farrell's expenses of care may be continuing, the district court judge refused any further award. I do not believe that these future expenses should be any less a charge on the ship than past expenses. To conclude as the Court now does that they are not is to ignore in part the salutary policy supporting the doctrine of maintenance and cure.

Maintenance and cure is an ancient doctrine. It reflects in part the concern which the state has had from an early date in a poor and improvident class of workers. See Mr. Justice Story in *Harden* v. *Gordon,* Fed. Cas. No. 6,047. It also recognizes the imperative necessity of the nation to maintain in peace and war a merchant marine.

---

[3] The District Court said:

"He will continue to have these spells and to have pain in the area of the fracture. He will need treatment and medical care from time to time and probably some care for the rest of his life. He was always a healthy individual before his accident and never showed any signs of epilepsy before then. The medical testimony also shows that his condition of blindness is permanent, that in all likelihood his convulsive attacks will continue, and possibly become more frequent, and without any possibility of a further cure. The attacks and headaches mentioned will require some care from time to time whenever they persist."

If men are to go down to the sea in ships and face the perils of the ocean, those who employ them must be solicitous of their welfare. Maintenance and cure is an inducement on the part of masters and owners to be solicitous of the health, safety, and welfare of seamen while they are in the service. It gives a degree of security, though injury or sickness be incurred. It gives service in the merchant marine a dignity equal to the important function it performs. It reflects "the great public policy of preserving this important class of citizens for the commercial service and maritime defence of the nation." *Id.* at p. 483.

Accordingly, the injuries of seamen arising out of the service were made a charge against the enterprise to the extent at least of maintenance and cure. Their maintenance and cure was indeed part of the cost of the business. It is nonetheless a legitimate cost though the expense continues beyond the time when a maximum cure has been effected.[4]

---

[4] The Shipowners' Liability Convention of 1936, 54 Stat. 1693, does not require a contrary result. Article 4, paragraph 1, provides:

"The shipowner shall be liable to defray the expense of medical care and maintenance until the sick or injured person has been cured, or until the sickness or incapacity has been declared of a permanent character."

But Art. 12 contains a power to depart from that standard in this type of case. It provides:

"Nothing in this Convention shall affect any law, award, custom or agreement between shipowners and seamen which ensures more favourable conditions than those provided by this Convention."