Ioanis **KOLERIS**, an infant, etc.

v.

**S.S. GOOD HOPE,** her boats, engines, etc., in rem, and Victor Shipping Corporation.

No. 8417.

United States District Court
E. D. Virginia,
Norfolk Division.

May 5, 1965.

Amato, Babalas, Breit, Cohen, Rutter & Friedman, Gerald Rubinger, Norfolk, Va., for libellant.

Seawell, McCoy, Winston & Dalton, John W. Winston, Norfolk, Va., for respondents.

DALTON, District Judge (sitting by designation).

This is a libel action brought by Ioanis Koleris, a citizen of Greece and former apprentice engineer on board the Liberian flag tank vessel GOOD HOPE, against the S.S. GOOD HOPE and Victor Shipping Corporation as owners, operators and agents of said vessel.

Libellant alleges:

(1) that on or about July 15, 1963, he was accidentally injured while in that vessel's service, such injuries being allegedly caused by the unseaworthiness of the GOOD HOPE and by the negligence of Victor Shipping Corporation, its owner and his employer, and that for these injuries he is entitled to damages totalling $45,000;

(2) that following his accident, he did not receive prompt and adequate medical attention, thus aggravating his condition, and that for such failure to render proper treatment he is entitled to additional damages totalling $30,000;

(3) that at the time he left the vessel's employment he was owed earned wages which have not been paid and which he is due, together with wage penalties, under 46 U.S.C.A. §§ 596, 597;

(4) that he is entitled to maintenance and cure.

Libellant makes several further contentions which seem to have arisen more from filling in the blanks on a form libel rather than from any serious or meritorious claim. There was no evidence introduced on these points, counsel did not press them in their post-trial memorandum, and such will not be considered by this Court.

The injury complained of allegedly arose from the transfer of a large bottle of freon from the refrigerator room of the GOOD HOPE to the main deck. The normal method of accomplishing this operation, according to the second engineer, Parissis, is to have two or three oilers and/or firemen take the bottle from the refrigeration room to the main deck from where it is lowered to the dock by means of tackle (Deposition of Parissis, pp. 8, 23). Koleris contends that on or about July 1, 1963, he was ordered by the chief engineer and the second engineer (presumably Parissis) to move, by himself, an almost empty bottle of freon (which, according to all testimony, is quite heavy and too much for one man to handle) up to the main deck. He says that he placed the bottle on a raised strip of metal in the doorway and as he was holding the container with one hand and attempting to get around it to the other side so he would be able to lift it down, the bottle slipped off of this metal projection and struck him across the abdomen. Koleris says he felt a slight cracking in his lower back then, and that he felt a pain in his left side after about a quarter of an hour which would come and go. He testified that he experienced pain every fifteen or twenty days thereafter. This alleged incident was not witnessed but libellant claims he reported it to the chief officer about nine days after the injury.

The second engineer testified that he was directly in charge of the removal of the freon bottles from the vessel and that none could be removed without his knowledge. He apparently would receive orders from the chief engineer and then see to the job himself (Deposition of Parissis, p. 9). He denies ever ordering or permitting Koleris to remove a freon bottle from the ship at any time or place, either alone or under supervision. He further positively states that no drums of freon were removed from the vessel on the day which libellant claims to have been injured (Deposition of Parissis, pp. 7, 9, 23). In addition, there is some conflict of testimony concerning whether Koleris, in his capacity of an apprentice engineer, would have occasion to move these freon drums at all.

Libellant testified that on July 14, 1963, he was seen by a physician at Jacksonville, Florida, who recommended a hernia operation. There is evidence that Koleris

was relieved of work on board ship once or twice a month (apparently both before and after the consultation with the doctor) because of pain. Koleris was admitted to the United States Public Service Health Hospital in Norfolk, Virginia on September 22, 1963, but because of certain fungus infections, the hernia was not repaired until October 8, 1963. Libellant claims that several times between the date of injury and the date he was admitted to the hospital he asked the master of the ship (Vassilious Vassiliou) to let him see a doctor. According to Koleris the master always refused, and even went so far as to erase his name from the list of those seamen who had signed up to see a doctor. This is flatly and emphatically denied by the master (Deposition of Vassiliou, p. 15). On September 12, 1963, Koleris apparently saw a doctor at Cartagena, Columbia with reference to a burn received from boiling water, but requested no examination as to the hernia condition from this doctor.

Koleris further alleges that he was promised a promotion to the job of oiler with a consequent raise in salary, and on the faith of this promise began performing the duties of an oiler. He says that he never received the extra pay (which is not disputed) and seeks to recover those wages in this Court.

The parties have stipulated that the law of the flag, Liberia, controls in this case and further that Liberian law is identical (as to the rights and remedies of seamen for injuries) to the non statutory general maritime law of the United States. This of course excludes all rights and remedies which have since been granted under the Jones Act. A statement of the controlling law came from the United States Supreme Court in The Osceola, 189 U.S. 158, 23 S.Ct. 483, 47 L.Ed. 760 (1903). The Court noted that a seaman had the following remedies against his employer:

(1) he could claim damages for injuries caused by any unseaworthiness of his vessel;

(2) he could claim damages for injuries caused by his employer's failure to furnish prompt and adequate medical attention;

(3) he was entitled to claim maintenance and cure in connection with his injuries or illnesses (which term encompasses both medical treatment and sustenance during the period of such treatment), however caused, unless they resulted from his own willful misconduct or unless they were willfully concealed at the time of his employment;

(4) he was entitled to damages for injuries caused by any negligent failure to provide him with maintenance and cure. See also: Gilmore & Black, The Law of Admiralty 248 et seq. (1957).

Under this law the injured seaman had no right to recover against his employer for injuries cause by the negligence of the ship's master or of any other officers or members of the crew. Libellant recognizes that he cannot proceed on a negligence theory (especially since libel is an action *in rem* and negligence is *in personam*) and insists that he is claiming damages for unseaworthiness of the ship and failure to furnish prompt and adequate medical attention.

Counsel predicates the charge of unseaworthiness on "the failure to furnish equipment of some type, i. e. a dolly or block and tackle" with which to move the freon containers. The Court is not certain of the scope of counsel's contention on this point but will examine the two possibilities as it sees them:

(a) that the ship was unseaworthy because no equipment was furnished with which the containers could be lowered from the deck to the dock. The testimony of Parissis would indicate that there was equipment for this task (Deposition of Parissis, p. 8). In addition, that part of the operation was not the cause of the alleged injury, and so is not material here;

(b) that the ship was unseaworthy because no equipment was furnished with which the containers could be moved from the refrigeration room to the deck. No

**970**

evidence has been introduced to the effect that such equipment is the normal thing for a ship of this type to have for this particular job. Indeed, keeping in mind the internal structure of a tanker and the route which these bottles would have to take to reach the deck, it is difficult for the Court to visualize how such a mechanism could be effectively installed and operated. On the other hand, Koleris himself testified that two men could have done the job easily (Deposition of Koleris, pp. 9–10) and so there is no showing of a necessity for such a setup. Libellant has offered nothing to persuade the Court that the lack of equipment which could be used in transferring freon containers from the refrigeration room to the deck (if such an arrangement is even possible) renders a ship unseaworthy. There is no evidence that there were not enough men available to do the job—in fact, the evidence points to the contrary (and it must be borne in mind that the second engineer testified that no freon tanks were removed on the day in question).

 In the final analysis, then, the charge of unseaworthiness must rest on the alleged improvident order given by Parissis. This would seem to sound in negligence, but there is a line of authority which allows recovery for unseaworthiness because of the act of a crew member. One of the first and leading cases in this area is Boudoin v. Lykes Bros. Steamship Co., 348 U.S. 336, 75 S.Ct. 382, 99 L.Ed. 354 (1955). However, this was a case of aggravated assault with a knife and whiskey bottle by a man who had consumed about a fifth of liquor, and the cases which allow an act of a seaman to constitute unseaworthiness seem to be mainly confined to the area of assault. See Baer, Admiralty Law of the Supreme Court § 1–5 (1963). Even if the Court were to take the principle that acts of officers or crew members can, in some instances, render a vessel unseaworthy, and apply it to the facts at bar, recovery would still be precluded, as the Supreme Court based the Boudoin case on the fact that the assailant did not have the temperament of an ordinary seaman but was rather a man of vicious nature and disposition. If the assault had been perpetrated by a man of ordinary disposition in a moment of rage, it would have been within the "usual and customary standards of the calling" and a "risk of the sea that every crew takes." 348 U.S. at 340, 75 S.Ct. at 385. No evidence has been introduced here to show that Parissis did not possess the skills of an ordinary second engineer. On the contrary, his credentials seem most adequate: he graduated from Brometheus Engineering School (a five year course), has a chief engineer's license issued by the Liberian government, a second engineer's license from the Greek government, and has been going to sea about seven years (Deposition of Parissis, pp. 3, 4). Therefore, even assuming *arguendo* that Parissis did improperly order Koleris to move the freon jar, this isolated incident on the part of an otherwise competent seaman would not render the ship unseaworthy, and libellant's only possible action would be one of negligence against the second engineer. As we have seen, such an action is not maintainable here.

 The Court thinks that libellant's claim for maintenance and cure is also without merit. The evidence shows that he was provided maintenance and cure in the United States Public Health Service Hospital at Norfolk at the expense of the shipowner. When he left the hospital he was "fit for duty" (Deposition of Dr. Rubinstein, p. 9) and the respondent owner owed him no obligation beyond that time. Farrell v. United States, 336 U.S. 511 (1949); Calmar Steamship Corporation v. Taylor, 303 U.S. 525 (1938).

 Koleris has likewise failed to establish lack of proper medical treatment. The hernia was repaired, and according to Dr. Rubinstein it was not an emergency situation (Deposition of Rubinstein, pp. 8, 9). Parissis testified that Koleris had said that he could continue work because the condition didn't need to be attended to at once (Deposition of Parissis, p. 19). The master testified that as soon as Koleris began insisting

that he needed an operation (which, according to Vassiliou, was the first time he had been apprised of libellant's condition) he sent him to the hospital at Norfolk (Deposition of Vassiliou, p. 19). The evidence does not convince one that Koleris was denied prompt and adequate medical attention to his detriment.

[7] The Court must also reject libellant's claim for wages due him as a result of allegedly taking over the job of an oiler. It seems that such a pay increase was discussed, but that it never received the necessary approval of the home office (Deposition of Vassiliou, p. 18). It further appears from the evidence that Koleris' position as an apprentice engineer entailed many varied tasks, including some which would normally be thought of as belonging to an oiler (Deposition of Parissis, p. 22; Deposition of Vassiliou, p. 19). Although Koleris from time to time may have indeed performed some duties of an oiler, there has been no showing that this was not to be expected of an apprentice engineer.

[8] It must be remembered with reference to all of the above contentions that libellant has the burden of proof, which entails something more than merely bringing the Court's mind to a state of equilibrium on the question of whether a certain event has occurred or not. At most, this is what Koleris has done on his strongest points. Throughout his testimony there are inconsistent elements. For example, even if we accept libellant's testimony as to his moving of the freon container, the Court thinks it highly improbable that this did, in fact, precipitate his hernia. The fact that the container may have struck him across the abdomen and at that time he felt a slight cracking in his back would, even if true, have little or no bearing on the matter of the hernia, which is caused by stress being applied to weakened muscles.

The Court holds that Ioanis Koleris has failed to carry his burden of proof and cannot recover against the S.S. GOOD HOPE and Victor Shipping Company. An order will be entered dismissing this action.