**Francis BLOUIN, Plaintiff,**

v.

**AMERICAN EXPORT ISBRANDTSEN LINES, INC., Defendant.**

**No. 66 Civ. 158.**

United States District Court,
S. D. New York.

March 5, 1970.

Fields, Rosen, McElligott & Auslander, New York City, for plaintiff; Thomas E. P. McElligott, Martin Shapiro, New York City, of counsel.

Daniel Flynn, New York City, for defendant.

## MEMORANDUM OPINION

LASKER, District Judge.

In this action seaman-plaintiff Blouin seeks recovery for maintenance and cure, unearned wages, and counsel fees. The complaint originally contained causes of action for negligence and unseaworthiness as well, but they were dismissed at the close of plaintiff's case. The jury which had been impanelled was also dismissed at that time, and the remaining issues were tried to the court. After considering the evidence and reviewing the applicable legal principles, I hold that plaintiff is entitled to recover for maintenance and cure.

### I.

On April 29, 1965, Francis Blouin appeared before Dr. George E. Burden to undergo a pre-employment physical examination prior to "signing on" as a member of the crew of one of defendant's ships. Dr. Burden, who was both employed and called to testify by defendant, rejected Blouin as not fit for sea duty because of hypertension (high blood pressure) and bronchitis. Blouin signed an examination form which Dr. Burden prepared. Above Blouin's signature appears the statement: "I have not been treated for any illness or injury by any private or Government doctor during the past 10 years except as included above." No illness or injury was "included above." Dr. Burden testified that he "specifically asked" Blouin about such previous afflictions. Dr. Burden also stated that he found a few rales at the base of Blouin's chest, that he thought it might have been bronchitis that caused them, that Blouin "had some congestion in his lungs," and that he did not examine further because Blouin's blood pressure was high enough so that "that alone would reject him." The recorded blood pressure was 180/104.

Blouin then exercised his right to a second examination by the Public Health Service and secured a "fit for duty" clearance from a Service physician, after

which he signed on for service aboard the SS. EXCHESTER, owned by defendant.

The EXCHESTER sailed from New York on May 12, 1965. It was on a Mediterranean tour, and the first port reached was Rota, Spain, on May 24. The captain of the EXCHESTER, Joseph A. Pagano, testified that on May 26, the date of the ship's departure from Rota, Blouin was reported as being under the influence of alcohol and was reprimanded. The same thing happened in Catania, Sicily, on June 3. On June 4, Blouin was "logged" and fined for misconduct, for failure to perform his duties, and for being under the influence of alcohol. He was logged again on June 12 in Venice, and either logged or reprimanded on June 14 in Trieste. (Captain Pagano's chronological account of the events from June 12 to 14 is somewhat confusing. The ship's log, from which he read, fails to clarify those events.)

The EXCHESTER arrived in Rijeka, Yugoslavia, on June 13. That night Blouin went ashore. He was brought back to the ship on the morning of the 14th by a police escort. While under the influence of liquor, he had exposed himself in a public restaurant. Captain Pagano ordered him not to go ashore again, and took away his pass, but later that day Blouin left ship anyway. When he returned, on the evening of the 14th, he was under the influence of alcohol.

On June 15th, Blouin went to the purser, Mr. Cyril F. A. Carthy, and requested a doctor "for my high blood pressure."[1] Carthy, who was the chief medical officer on board ship, noted that no accident or injury was reported and none claimed. Carthy notified the ship's agent that a doctor was requested, without delay, and at 11:15 A. M. on June 15th, one Dr. Nonveiller arrived and performed an examination. The doctor diagnosed Blouin's condition as "Acute alcoholism, exhibitionism, High Blood Pressure (180/90)." He prescribed certain tablets and recommended that Blouin be hospitalized in Barcelona, Spain, to which port the EXCHESTER was scheduled to sail that day. The doctor explained to Carthy and Pagano that Rijeka lacked proper facilities to treat Blouin. At trial, Carthy noted that he had visited two Rijeka hospitals and "readily understood" what the doctor meant.

At 4:00 P.M. on June 15, Carthy was informed by another officer that Blouin had collapsed on the deck. When Carthy arrived, the plaintiff was breathing heavily, complained of a violent headache, and could not stand unaided. Carthy and Captain Pagano arranged for Blouin to be taken to the ship's hospital, where he was confined and treated until June 18, when the EXCHESTER arrived in Barcelona. There, he was removed from the ship and taken to the Serrallach Urological Clinic. The diagnosis of one Dr. Alomar was "Crisis of arterial hypertension with intensive headache and arterial tension of 200." On July 1, the Clinic Director where Blouin was confined reported that the "hipertensive crisis" (sic) had diminished and that Blouin could embark again.

After his release from the Barcelona clinic, the plaintiff was flown back to the United States. He entered the Unit-

---

1. There is some confusion as to the date of this request. Mr. Carthy testified that it was made on June 15th and The Master's Report of Medical Attention, which Carthy prepared and Blouin signed, stating his request for a doctor in writing, was prepared on June 15th. However, the Medical Log states that the illness originated on June 13th, and defendant's Medical Department Report of Illness, prepared in New York, indicates that Blouin first requested a doctor on June 13th.

The Master's Report, the Medical Log and the Medical Department Report were all introduced into evidence by the plaintiff.

As noted above, there is some confusion as to the events occurring on June 13th. Taken as a whole, the evidence makes it more likely that Blouin first requested medical attention on June 15th after going ashore to Rijeka on the 13th and 14th.

ed States Public Health Service Hospital, Staten Island, on July 13, 1965, and remained there until August 25, 1965. The hospital admission record notes:

"This 52 year old colored male has a 24 year history of increased blood pressure. During this time the patient had been treated with a variety of medications on an outpatient basis. During the past two years the patient has noted chest pain and dyspnea on exertion. The patient has a two year history of orthopnea and occasional paroxysmal nocturnal dyspnea. On 6/18/65 the patient had a blackout spell aboard ship. * * * Since June 18th the patient has noted headaches * * * These are not relieved by aspirin. There is no history of trauma or previous unconsciousness."

Dr. Eugene Clark, a cardiologist called by the defendant, summarized Blouin's Staten Island hospital records. Those records indicate that upon his admission the plaintiff complained of headaches, and showed signs of moderate elevation of the blood pressure and possible enlargement of the liver. Blouin's blood pressure on the first day ranged from 150/108 to 156/106. The subsequent readings, for the next few days, ranged from 135/90 to 156/96. Dr. Clark characterized these as signifying "a very mild and a labile hypertension. It is present at times and absent at other times."

The hospital records say that Blouin had some congestive heart failure and his final diagnosis contains that finding. However, Dr. Clark maintained that none of the tests verified the occurrence of congestive heart failure, and stated that in his opinion the plaintiff had "mild hypertension and signs of a sub-acute or subsiding bronchitis." He testified that an electrocardiograph was taken on the second or third day, and that the results were entirely normal. Upon cross-examination, plaintiff's attorney mentioned a subsequent electrocardiograph the result of which was abnormal. Dr. Clark attributed the ab-

normality to the administration of digoxin to the patient.

During Blouin's confinement in the Marine Hospital from July 13, 1965 to August 25, 1965, he was treated for hypertension, myocardial infarction, and heart congestion. He also underwent a gall bladder operation. Most of his blood pressure readings were entirely normal, his lungs were repeatedly clear from July 17 on, and he did not complain of headaches except on the date of admission. The discharge diagnosis was "hypertensive cardiovascular disease—congestive heart failure—tiniea pedis with onychomycosis."

On October 30, 1965, Blouin was readmitted to the Marine Hospital. He was complaining of occasional shortness of breath, weakness, fatigue, severe chest pain, and blacking out. He became asymptomatic soon after admission, and remained so until his discharge on December 1, 1965. During this second hospital stay, his blood pressure remained at normal levels. Although the discharge diagnosis did not refer to heart disease, it did state that Blouin had essential hypertension.

From January 5, 1966 to February 8, 1966, Blouin was hospitalized again. This time his gall bladder was removed. There were no complaints concerning his heart, his electrocardiograms were normal, and 90% of his blood pressure readings were within normal limits.

Blouin returned to the medical clinic on March 22, 1966, and was declared fit for duty insofar as heart and chest were concerned.

Blouin's fourth hospital confinement extended from December 19, 1966 to January 6, 1967. His basic malady at that time concerned an inability to use his right hand.

Blouin was treated in the medical clinic of the Marine Hospital on September 13, 1967, for hypertension. His blood pressure was 140/100. On January 28, 1968, he came to the clinic and complained of blackout spells. He was found to be "doing well" on July 22, 1968, and to have

"no shortness of breath * * * no chest pain" on September 19, 1968.

In addition to the above visits to the hospital, Blouin appeared at the clinic on several other occasions, too numerous and insignificant to record here. On several of these occasions the hospital records mention his long history of alcoholism.

The last examination which Blouin underwent, prior to the trial, was conducted by plaintiff's sole witness, Dr. Harry Sherman, on October 1, 1969. Dr. Sherman found him to have swollen legs and liver, an enlarged heart, congestive heart failure, and, in general, "a picture of chronic heart disease." Dr. Sherman testified that a fall on a ship could aggravate a condition of high blood pressure and that a blackout could result from such a condition.

At no time since Blouin returned to the United States from Barcelona has the United States Public Health Service declared him fit for duty. Dr. Sherman stated that his unfit-for-duty condition is permanent. Dr. Clark concurred in this conclusion.

## II.

Plaintiff contends that he is entitled to maintenance and cure for his hypertension and heart condition, which, he alleges, are the bases for the Public Health Service's refusal to mark him fit for duty. He maintains that defendant failed to provide adequate medical treatment from the period between June 13, 1965 (when Blouin says he first complained of illness) and June 18, 1965, when he was taken ashore at Barcelona, and that, in addition, defendant should have relieved him of his ordinary duties on June 15 after the medical examination on board the ship, and prior to his blackout. Plaintiff claims that defendant's conduct aggravated his condition so that he has not been fit for duty since.

Defendant, in turn, argues that plaintiff's condition results solely from his own misconduct, that plaintiff fraudulently concealed his prior history of high blood pressure, chest pain, and dyspnea, that plaintiff did not have a heart condition upon his release from the hospital on August 25, 1965, but that if he did, the condition was not aggravated by his experiences aboard ship, and that, in any event, plaintiff attained maximum medical cure when he was released from the hospital on August 25, 1965, after his first period of confinement.

■■■ Plaintiff's claim for maintenance and cure for his hypertension cannot be sustained. In his pre-sign-on examination, Dr. Burden found that plaintiff suffered from hypertension and rejected him for that reason. Although a seaman may recover maintenance and cure for a pre-existing illness that manifests itself while the seaman is in the service of the ship, Gilmore and Black, The Law of Admiralty (1957), p. 254, if the manifestation of the illness results solely from the seaman's intoxication then it is the seaman's own misconduct which caused the illness, Barlow v. Pan Atlantic S.S. Corporation, 101 F.2d 697, 698–699 (2d Cir. 1939), Victoria v. Luckenbach S.S. Co., Inc., 141 F.Supp. 149 (S.D.N.Y.1956), Weinfeld, J., aff'd 240 F.2d 349 (2d Cir. 1957), and maintenance and cure should be denied, Aguilar v. Standard Oil Co., 318 U.S. 724, 63 S.Ct. 930, 87 L.Ed. 1107 (1943). Here, the evidence establishes that plaintiff's drinking bouts were responsible for the complaints diagnosed in Rijeka and Barcelona as high blood pressure. Dr. Clark testified that alcoholism "has a temporary effect of elevating the blood pressure while the patient is intoxicated," and that consumption of substantial amounts of alcohol would be "sufficient to bring about a blood pressure of 180/90", which is the Rijeka reading. In this regard, it is significant to note that prior to the Rijeka episode Blouin worked on the EXCHESTER for two weeks without any incidents—no alcoholism, no symptoms of high blood pressure. It is only after he had begun to sample the pleasures of shore leave—in conscious disregard of his duty to obey Captain Pagano's orders, see Aguilar v.

Standard Oil Co., supra, 318 U.S. at 731, 63 S.Ct. 930—that he suffered from occurrences of hypertension.

■ In view of the fact that plaintiff cannot recover for the hypertension because of his own misconduct, it is not necessary to adopt defendant's alternative position that Blouin's failure to disclose his prior treatment for that illness and for respiratory ailments bars recovery. It should be noted, however, that non-disclosure of a pre-existing illness or injury is fraudulent (and hence precludes recovery of maintenance and cure) only if the seaman knows, or reasonably should have known, that the affliction was disabling and would prevent him from performing his duties. Ahmed v. United States, 177 F.2d 898 (2d Cir. 1949); Burkert v. Weyerhaeuser Steamship Co., 350 F.2d 826 (9th Cir. 1965); Tawada v. United States, 162 F.2d 615 (9th Cir. 1947). There is no indication on the record that Blouin knew, or should have known, that his long history of high blood pressure would prove incapacitating. Indeed, it was not incapacitating until he began to drink heavily.

■ Plaintiff's claim for maintenance and cure for his heart condition must be treated differently. As indicated earlier, he did not complain of heart problems or pains while aboard ship, and neither of the diagnoses made in Europe (at Rijeka and Barcelona) mentioned heart problems. Nor did Blouin complain of heart ailments when he was admitted to the Public Health Hospital on Staten Island in July 1965. Nevertheless, the hospital records reflect that he was treated for congestive heart failure, and the final diagnosis, issued just prior to his release on August 25, 1965, states that he suffered from that condition. Dr. Clark challenged that diagnosis in court, but, in view of the courts' traditional solicitude for the welfare of seamen, see Gilmore and Black, The Law of Admiralty (1957), pp. 253–254, and that neither Dr. Clark nor any other physician retained by the defendant ever examined Blouin, I find that the conclusions of the Public Health Service that Blouin returned from the voyage with a condition of congestive heart failure should be given credence. · Since neither of the pre-employment physical examinations given to Blouin revealed such a condition, it would appear that his congestive heart failure arose during the time in which he was " 'in the service of the ship,' by which is meant that he [was] generally answerable to its call to duty * * *." Farrell v. United States, 336 U.S. 511, 516, 69 S.Ct. 707, 709, 93 L.Ed. 850 (1949). Under such circumstances, Blouin is entitled to maintenance and cure in the absence of a showing that his own wilful misconduct caused the heart condition.

It is difficult to determine the "cause" of Blouin's heart disease from the scanty record before the court. Plaintiff maintains that it is attributable to a fall which he sustained a few hours after his ship-board examination in Rijeka. Although it was established at trial that Blouin was found on the deck of the ship, the only proof that such a fall actually occurred consists of plaintiff's statement to that effect in his deposition, and his similar statements to doctors and nurses at the Public Health Service Hospital. However, while Blouin has not proven that his heart condition resulted from the fall, nor that he fell to the deck because defendant had failed to relieve him of his duties, these defects in the proof do not preclude recovery for maintenance and cure. As the Supreme Court puts it: " * * * why and how he sustains injury does not affect his right to maintenance and cure, however decisive it may be as to claims for indemnity or for damages for negligence." Farrell v. United States, supra, at p. 516, 69 S.Ct. at p. 709. As indicated above, it is only if plaintiff himself was responsible for the injury because of gross misconduct that recovery is not available. Defendant has not proven that gross misconduct on Blouin's part caused the heart condition, and consequently plaintiff is entitled to maintenance and cure for that illness.

■ The rule for determining the amount of recovery available for maintenance and cure is:

"A seaman's right to maintenance and cure continues for a reasonable time after the voyage has ended; this period consists of the time necessary to effect a maximum cure, i. e., so that no further improvement in the seaman's condition is to be expected." Wilson v. United States, 229 F.2d 277, 280 (2d Cir. 1956).

Blouin was released from the Public Health Service Hospital on August 25, 1965, with a diagnosis of "hypertensive cardiovascular disease—congestive heart failure * * * " He was readmitted on October 30, 1965, and discharged again on December 1, 1965, this time without any mention of heart disease. He was confined yet again between January 5, 1966 and February 8, 1966, and returned to the clinic on March 22, 1966, at which time he was declared fit for duty insofar as his heart and chest were concerned. It is on this date—March 22, 1966—that I find "maximum cure" to have been attained, according to the meaning given that term by Farrell v. United States, supra, 336 U.S. at 518, 69 S.Ct. 707 and as defined above by Wilson v. United States.

■■ While it is true that the fact that a seaman is found fit for duty (here as to the plaintiff's heart) does not conclusively establish that maximum cure has been achieved, Koslusky v. United States, 208 F.2d 957, 959 (2d Cir. 1953), and while it is further true that Dr. Sherman characterized Blouin's pre-trial condition as reflecting "a picture of chronic heart disease," close scrutiny of plaintiff's hospital records after March 22, 1966 reveals that out of twenty separate examinations and hospital visits extending to the date of trial, Blouin's heart condition was treated only once. It is therefore reasonable to conclude that his inability to attain clearance for maritime duty is not due to the heart injury which he sustained during the 1965 voyage on the EXCHESTER.

At least as to his heart, then, Blouin attained a status of "maximum cure" as of March 22, 1966. Having spent 144 days outside the Public Health Service Hospital prior to March 22, 1966, at the rate of $8.00 per day plaintiff is entitled to $1,152.00 in maintenance. See Bartholomew v. Universe Tankships, Inc., 279 F.2d 911 (2d Cir. 1960). However, plaintiff is not entitled to his claim of $400 in wages for the period following his hospitalization in Barcelona, since the immediate cause of his leaving the EXCHESTER was his own misconduct. See Dailey v. Alcoa Steamship Co., 337 F.2d 611 (5th Cir. 1964), Wisdom, J.

■ Plaintiff's attorneys' request for counsel fees must be denied. There is absolutely no showing whatsoever that defendant's refusal to provide maintenance and cure following the filing of this suit was "callous" or made in bad faith, within the meaning of Vaughan v. Atkinson, 369 U.S. 527, 530–531, 82 S.Ct. 997, 8 L.Ed.2d 88 (1962).

The foregoing constitutes the findings of fact and conclusions of law required by Rule 52, Federal Rules of Civil Procedure.

Settle order on notice.