**DANSTRUP**

v.

**THE RICHMOND P. HOBSON et al.**

No. 19740.

United States District Court,
E. D. New York.

Jan. 18, 1954.

Silas Blake Axtell, New York City, for libellant.

Leonard P. Moore, U. S. Atty., Brooklyn, N. Y., for respondent, Corydon B. Dunham, and Xavier N. Sardaro, New York City, of counsel.

GALSTON, District Judge.

This is a libel in admiralty for maintenance and cure. Following the trial of the action I rendered an opinion, dated May 28, 1953, concluding that the libel should be dismissed for lack of jurisdiction, because of the absence of proof that libellant had complied with the statutory requirement of filing a notice of claim with the proper governmental agency before bringing an action. Danstrup v. Richmond P. Hobson & United States, D.C., 112 F.Supp. 851. Subsequently, upon an application by the libellant I granted an order, dated July 2, 1953, reopening the trial, "so that libellant may offer proof as to his filing the notice of claim with the respondent and other parties and complying with all statutes and regulations in regard to said filing."

The evidence presented at the reopening of the trial supplied the necessary proof of compliance with the statutory requirement, and the regulations promulgated pursuant thereto. The respondent does not now contend otherwise.

With respect to the merits, the claim for maintenance and cure is based upon an alleged injury suffered by the libellant on or about October 9, 1944, at Leghorn, Italy. At the time he was serving as chief engineer aboard the S.S. Richmond P. Hobson, a vessel operated by the Isbrandtsen Steamship Company as general agent for the United States.

While he and another man were pulling on a five ton chain fall in an effort to free the frozen shaft on the turning engine, his foot slipped on some oil on the grating, and he, so he said, "came down with all my weight hanging to that chain hoist, and I felt something give right across the stomach on the left side and the groin, and around my back on the left side." He stated that it was not very painful at the time and he continued working. About 9:00 o'clock that night the pain became severe and continued during the night. The following morning he was taken to the U. S. Army Hospital at Leghorn. He remained in the hospital for ten to twelve days. His condition, according to the hospital record, was diagnosed as "cardiac arryhymia (arrythmia); auricular fibrillation. C.U."

He went aboard the Hobson again, and returned to the United States with the ship in November, 1944. He was paid off in Norfolk, Virginia. He returned to New York City, and on December 6, 1944 he entered the U. S. Marine Hospital, Staten Island. At the time of his admission, libellant stated he was bothered by tenderness in the lower left quadrant and weakness in the lower abdomen. X-ray examinations were taken of the kidneys on December 11, 1944. They revealed a double ureter on the left kidney, but no other abnormalities. The diagnosis was arteriosclerotic heart disease with auricular fibrillation. Digitalis brought about marked improvement, and libellant was discharged on December 21, 1944, condition improved, with a recommendation that he take one month's convalescence leave.

In January, 1945, he returned to work for Isbrandtsen as port engineer, and then in February he signed on as chief engineer of the S.S. "W. P. Few", another Liberty ship operated by Isbrandtsen as general agent for the United States.

Libellant was given a physical examination when signing on for both the Hobson and the Few. The report, prior to the Hobson voyage, of the examining doctor notes "frequent extra systoles" of the heart. Libellant was found fit for sea duty on both occasions. He served aboard the Few until it was retired from service on or about April 6, 1946, a period of about 14 months, during which the ship made a trip to Europe and returned by way of the Pacific.

It was during this trip on the Few that libellant first noticed swelling of his lower extremities and abdominal cavities. He testified that his body tissues filled up with fluid about four months after he started work on the Few. He did not ask for medical attention, but continued to perform his duties until the end of the voyage. Following his discharge from the Few in April, 1946, libellant consulted his own doctor for treatment. He received injections of mercupurin to relieve the swelling, and digitalis. There is in evidence a document entitled "Full Release of all Claims", dated July 29, 1946, and signed by libellant, stating that, in consideration of the payment of $578.50 to him, the seaman released the

"United States of America, War Shipping Administration, Isbrandtsen Company, and particularly the 'W. P. Few' * * * from all * * * claims and demands * * * for all losses, injuries or damages arising out of or connected with an injury received by me on the Steamship 'W. P. Few' on or about the tenth day of October 1944 at Leghorn, Italy, including wages, maintenance and cure."

It was not explained during the trial why this "release" refers to the Few with respect to an accident occurring in October, 1944, when libellant admittedly was serving aboard the Hobson.

In August, 1946, he applied for another berth, but was rejected as medically unfit. On October 16, 1946, he was admitted to the United States Marine Hospital, Staten Island. The Discharge Summary, signed by Dr. C. Boswell, part of the hospital records, states the following:

"This 61 year old merchant seaman was admitted to the hospital on October 16, 1946, with chief complaint of swelling of his abdomen, ankles and genitalia. His present illness began two weeks prior to admission. However, the patient has a long history of cardiac decomposition associated with hepatic cirrhosis. He has been taking digitalis for five or six years.

\* \* \* \* \* \*

"Extensive laboratory work-up was done which confirmed the diagnosis of hepatic insufficiency, auricular fibrillation, arterio-sclerotic coronary disease and persistent ascites. No significant pathology was found in the G. I. tract and the kidneys were found to be of fair function."

Libellant was discharged on February 7, 1947, with instructions to continue digitalis, ammonium chloride and caffine medications and to return to the hospital for periodic injections of mercupurin. The diagnosis was hepatic cirrhosis and arterio-sclerotic heart disease.

He visited the Marine Hospital as an out-patient two to three times weekly until April 1, 1947. On April 1st he was again admitted to the Marine Hospital complaining of increasing swelling of the lower extremities and abdomen, as well as exertional dyspnea (labored difficult breathing). The "source" of admission is stated on the hospital records as the W. P. Few, as it was on the October 1946 admission. An inter-departmental memorandum of the Marine Hospital, dated April 14, 1947, requested consultation to see what the libellant could be offered in the way of operative procedure for the alleviation of his ascites. The left kidney was removed on May 14, 1947, and the ureter on the left side was anastomosed to the peritoneal cavity for aid in draining off the ascitic fluid.

A letter signed by Dr. Charles Ferguson, Senior Surgeon, USPHS., Chief of Urological Service, dated December 5, 1947, was put in evidence by libellant. It reads in part as follows:

"The above named (Hans Danstrup) was admitted to the U. S. Marine Hospital, Staten Island, New York, with the chief complaint of swelling of his abdomen, ankles and genitalia. He has a history of cardiac decompensation associated with hepatic cirrhosis. He stated that he has been taking digitalis for five or six years.

"Examination at this hospital confirmed the diagnoses of hepatic insufficiency, auricular fibrillation, arteriosclerotic coronary disease and persistent ascites. There was fair function of the kidneys.

"The recurring ascites disappeared when he received a surgical operation for its relief on May 14, 1947. \* \* \* There was considerable scar formation about the left kidney. The cause of the scar formation is not apparent at the present time. It apparently is the result of an alleged contusion of this side which the patient states he suffered some time ago before entering the hospital.

"This condition of the kidney does not bear any causal relationship to the cirrhosis of the liver.

"The left kidney was removed and its ureter was utilized as a conduct for the ascitic fluid. \* \* \*.

"Patient is at home convalescing. He is still under treatment at this hospital as an outpatient for his liver disease."

Libellant continued to visit the Marine Hospital as an outpatient until March 4, 1948, when he again entered the hospital. As on the two previous occasions, the W. P. Few is designated as the vessel.

His next stay as an inpatient at the Marine Hospital was from May 26, 1948 to July 2, 1948. Subsequent periods in the hospital were from October 25, 1948 to April 18, 1949, from September 26, 1949 to November 11, 1949 and from December 3, 1949 to December 16, 1949. On each of these occasions the hospital records list the "source" of libellant's entry as the S.S. W. P. Few. A memorandum, dated January 7, 1949, signed by Dr. C. Boswell and presenting libellant's case to another doctor, put in evidence by libellant as part of the Marine Hospital records, summarized the libellant's condition and course of treatment:

"This patient * * * (was) admitted to the Medical Service on October 25, 1948 because of abdominal swelling, swelling of the ankles and coughing up of blood. The onset of present illness was apparently in 1942 when patient developed palpitations. At that time he was seen by a private physician who diagnosed his case as auricular fibrillation and put the patient on digitalis * * *.

"In December 1944 patient was admitted to our hospital for the first time because of an injury aboard ship which was followed by pain in the right and left upper quadrants. *Thorough examination at that time failed to reveal any symptoms related to the trauma* but enlarged liver and auricular fibrillation were noted. Patient was discharged and continued to work for sixteen months taking digitalis all the while. *In October, 1946, after a period of unusual physical stress and activity patient developed ascites and edema* and after three months treatment by a private physician was again admitted to this hospital. After several paracenteses a vitallium button was placed in the abdominal wall with the idea of draining ascitic fluid into the tissues of the abdominal wall. The results from this procedure, however, were unsatisfactory because of too great disten-

tion of the tissues of the abdominal wall. *In April 1947, ascites and edema again became intractable and the patient became discouraged and, having heard of surgical procedures designed to relieve ascites, demanded in desperation that something in this line be done for him. On April 24, 1947 the left kidney was sacrificed* and the renal pelvis was turned into the peritoneal cavity. Following this there was improvement in patient's symptoms * * *. However, after about three months the albumin disappeared from the urine and ascites and peripheral edema again became severe. * * * On each occasion bed rest brought about restoration of compensation. * * *." (Emphasis added.)

The memorandum of Dr. Boswell discusses the findings of the physical examination on the last admission, and then continues as follows:

"In view of past history of intractability and in view of dual findings of enlarged thyroid gland, nervousness and tremors together with the suggestive cholesterol levels a trial of anti-thyroid drugs was decided upon. * * * The response to the anti-thyroid drugs was dramatic. Patient's sense of well-being was improved within four to five days * * *. On the basis of this therapeutic response we now consider him to be a case of hyperthyroid heart disease."

The memorandum concludes with the following comment:

"Dr. MacGavack agrees with the diagnosis of thyrotoxic heart failure.

"He believes pt could best be treated by *total* thyroidectomy. Use thyroid extract afterwards if necessary. Pt is agreeable to operation."

A thyroidectomy was performed on April 11, 1949 for removal of the thyroid gland.

Despite the optimism contained in Dr. Boswell's memorandum that was not the

last of libellant's visits to the hospital or to the operating table. On October 19, 1949 an "exploratory operation" was performed of the left ureter and peritoneal-renal-pelvic closure. The operation report describes the operation as follows:

"On opening the abdomen there were multiple adhesions * * *; there were multilocular and encapsulated pockets containing brownish colored fluid scattered throughout the abdomen; there was one large pocket anterior to and surrounding the spleen, * * *; the liver * * * has the gross appearance of advanced Laennec's cirrhosis of the liver; * * * it is believed that the source of his pain was the large and encapsulated fluid in the neighborhood of the spleen; this encapsulation does not involve the outlet of the anastomosis of the left ureter to the peritoneal cavity; this appears to be patent, * * *; no evidence of leakage of urine; * * *."

The opening of the ureter into the peritoneal cavity was closed up on this operation.

On December 3, 1949 libellant had a sudden onset of acute abdominal pains and was readmitted to the Marine Hospital. An emergency operation was performed. The operation report of the hospital states the belief that the patient's symptoms were due to adhesions and large collections of loculated fluid. Operative diagnosis is of chronic intestinal obstruction due to ascites and adhesions, multiple intra-abdominal adhesions due to ascites, chronic peritonitis. Post-operative course was "quite smooth and uncomplicated," and libellant was discharged in an improved condition, with indefinite convalescent leave recommended, on December 16, 1949. Subsequently he has gone to private doctors for treatment.

The foregoing account discloses a distressingly long series of visits through the years by libellant to the Marine Hospital and to private doctors for treat-

ment and operations in an effort to obtain relief from his physical disabilities. As noted in the court's opinion, rendered May 28, 1953, Danstrup v. Richmond P. Hobson and United States of America, supra, however, since libellant filed the present libel more than two years after the alleged injury of October 10, 1944, his right of recovery, assuming there is a right to maintenance and cure here, would be limited to a period from August 31, 1949—i. e., from two years before the filing of the present libel.

■ The right of a seaman to maintenance and cure is, of course, construed with great liberality. It is not restricted to cases where the seaman's employment is the cause of the injury or illness. Calmar S.S. Corp. v. Taylor, 303 U.S. 525, 58 S.Ct. 651, 82 L.Ed. 993. On the other hand, the seaman must, at the time he incurs the injury or illness, be "'in the service of the ship,' by which is meant that he must be generally answerable to its call to duty". Farrell v. United States, 336 U.S. 511, 516, 69 S.Ct. 707, 709, 93 L.Ed. 850. That is, if an injury or illness manifests itself during the seaman's employment, he is entitled to maintenance and cure regardless of whether it resulted from the performance of his duties. Aguilar v. Standard Oil Co. of N. J., 318 U.S. 724, 63 S.Ct. 930, 87 L.Ed. 1107; Farrell v. United States, supra.

In the instant case the evidence indicates that libellant's chief complaint, insofar as the symptoms were visible and patent, which caused him to seek medical attention, was the swelling of his legs and ankles, and fluid collecting in his abdominal cavities. Much was done subsequently in an effort to find the cause of the edema and ascites, and to give relief to libellant. The various operations which libellant underwent were related to obtaining such relief. As has been noted, the swelling and collecting of excess fluid manifested themselves in 1946, which, of course, was long after libellant had finished his tour of service on the Hobson. Therefore it cannot be said that the illness of which libellant

complains, as it relates to the edema and ascites, became "manifested" while he was serving on the Hobson.

 The illness in Leghorn, Italy, occurred during libellant's service on the Hobson. Similarly his admission to the Marine Hospital on December 6, 1944 is connected with his service on the Hobson. Since there can be no question about the connection between libellant's illness on these two occasions and his service on the Hobson, the issue whether it was caused in the performance of libellant's duty aboard the vessel is of no consequence in respect to his right to maintenance and cure for such periods. However, libellant is precluded from recovering in this action for those periods because he was dilatory in instituting his libel. Moreover, apparently because of the "Release" of July 29, 1946, libellant does not seek maintenance and cure before that date.

Libellant contends that he is entitled to maintenance and cure in respect to the totality of his disabilities, on the ground that all his subsequent illnesses are attributable to the accident which he suffered aboard the Hobson on October 10, 1944.

Dr. William T. Power, who testified for libellant as a medical expert, stated that in his opinion injury sustained by libellant on the Hobson was a competent producing cause of his present condition, as well as of the treatments and operations he has had to undergo. In Dr. Power's opinion, libellant sustained an injury to the kidney which in turn aggravated a previously existing heart condition and may have activated a thyroid condition. The evidence discloses that Dr. Power examined the libellant on April 29, 1948, but that his expert opinion is based largely upon an examination of abstracts of the records of the United States Marine Hospital. The doctor's conclusion that there was traumatic injury to the kidney is not based upon a personal examination of libellant before or at the time of the accident or at the time the kidney was removed, but upon the hospital record abstracts. Upon cross-examination he admitted that he was assuming that the hospital records show there was a traumatic injury. It may be noted that all of the records and reports of the Marine Hospital in respect to the libellant were put in evidence by him "without reservation."

The records of the U. S. Army hospital in Leghorn, Italy, on the admission and treatment of the libellant, fail to disclose any connection between the accident when pulling on the chain lift and a kidney injury. In fact, the records make no mention of an accident as the cause of libellant's requiring hospitalization at the time. The records state:

"NYD acute cardiac failure (obs for) ID"

An x-ray examination was made of the kidneys on December 11, 1944, during libellant's confinement at the Marine Hospital following his discharge from the Hobson. It revealed no abnormalities associated with trauma. The records on both occasions show the diagnosis to be of heart trouble, auricular fibrillation, an ailment which libellant admittedly had before going on the Hobson.

The report by Dr. Ferguson, who performed the operation removing the kidney, that the kidney disclosed "considerable scar formation", has been quoted earlier herein.

On the other hand, there are the statements in the hospital records of examining doctors that there was fair functioning of the kidney, and of the pathologist who examined the removed kidney that it was normal.

Dr. Cary Eggleston, medical expert called by the respondent, testified that scarring of the kidney could occur from many different causes and that in a person of libellant's age, 62 years in 1947 when the kidney was removed, scarring could be a natural process. The doctor readily admitted that a kidney could be so damaged as to cause changes in the heart and other parts of the circulatory system. He stated, however, that from an examination of the Marine Hospital

records, he was unable to find any such impairment of the kidney in libellant. It was his opinion that libellant's condition was caused by "a chronic congested heart failure associated with and presumptively due to auricular fibrillation, which in turn presumptively brought on an over active or toxic thyroid gland condition". As to the kidney, he was of the opinion that the chronic congested heart failure could result in secondary changes in the kidney which would ultimately lead to damage.

The court put several questions to Dr. Eggleston:

"The Court: Assume that on October 7, 1944, while this man was chief engineer on * * * the Hobson, he was hoisting a three-ton weight, and while endeavoring to hoist the weight he slipped, went to the floor and experienced a pain in the left groin, and thereafter other symptoms like nausea and so on. What I am interested in is, could such an experience have exaggerated any physical abnormality that the man was suffering from at the time he signed on in June of 1944?

"The Witness: Conceivably it could.

"Q. Doctor, while conceivably it could, what are possibilities, whether it did or not? A. From consideration of the further course of this patient's illness systems (sic), I think one would have to assume that nothing serious took place; one might suspect that he had ruptured himself, but there is no evidence that I recall in the record to indicate that he did.

"The Court: Assuming that he had this fluttering heart condition which is described in this phrase regular irregularity in one of the reports, would that heart condition have been affected by the accident?

"The Witness: It could have been, Your Honor. I do not see the evidence that it was."

In examining the records of the Marine Hospital concerning the libellant, Dr. Eggleston concluded as follows:

"I found evidence that this patient had had severe attacks of congested heart failure due to the intervention of auricular fibrillation, that is a disturbance of the heart's mechanism by which the auricles are thrown into an irregular method of beating, usually rapid, and is commonly associated with periods of congested heart failure. He apparently had those periods of congested heart failure, for throughout the record are scattered references to swelling and shortness of breath and enlarged liver, as well as edema, that is swelling of the lower extremities, and ascites, fluid in the abdominal cavity."

The evidence in the case does not support a conclusion that libellant's condition from October, 1944, to the present is solely attributable to an injury to the kidney suffered in the accident with the chain fall. The examining doctors at the Marine Hospital knew of the accident, as disclosed by an account thereof in the various hospital reports. Nevertheless there is nothing in any of the reports to indicate that the doctors who attended libellant attributed his heart, liver and thyroid condition to an injured kidney. The fact that the kidney, when removed, was found to be scarred is evidence that there was some injury to it, possibly from the 1944 accident. However, from the various reports contained in the Marine Hospital records, it appears that the doctors found no significance in the injury in relation to libellant's subsequent symptoms and condition.

There is the possibility that the 1944 accident resulted in aggravating libellant's pre-existing condition. The fact that he became ill enough within a day or two thereafter to require hospital care is of some significance. The important question is, however, whether the aggravation was of such a serious nature

that the subsequent illnesses could be attributed to the accident.

As noted, after his stay in the hospital at Leghorn for ten to twelve days, libellant returned to the Hobson and remained aboard the vessel, presumably fully able to perform his work, until the voyage's end in November, 1944. After a stay in the Marine Hospital for some fifteen days, and a month's convalescence leave, he felt able to go back to sea. He was found fit to return to sea in January, 1945. In this connection it may be noted that Dr. Eggleston testified that a man with auricular fibrillation could be recommended to go on board a ship as chief engineer of a cargo vessel if he were adequately controlled and properly trained in his diet and use of digitalis, and limitation of salt. It has been pointed out that libellant first developed edema and ascites on the trip on the Few, about four months after starting work on the vessel, which would mean about May or June, 1945. Nevertheless he remained aboard the ship and continued to work until the Few was laid up, a period of about ten months more. Libellant explained that since the Few was in the Pacific where it was hot, he perspired freely, which gave relief from the fluid collecting in his body. The fluid continued to collect, however, and his perspiring in no way served to cure the cause of his developing the edema and ascites. Libellant testified, moreover, that although digitalis had been prescribed for his heart condition, he did not take any during his trip on the Few. Under the circumstances there is evidence to support the respondent's contention that libellant's work aboard the Few contributed to a substantial degree to his subsequent state of ill health.

From an examination of all the evidence it would appear that libellant's need for treatment and operations is the result of a progressive worsening of a heart condition which dated back to 1942, when he collapsed from heat prostration and was prescribed digitalis. The evidence fails to establish that any injury he might have suffered to his kidney in October, 1944, was the source of libellant's subsequent ailments, or that such injury, if any, aggravated an existing condition to the extent that all the subsequent physical ailments and consequent disabilities could be attributed to such aggravation. In view of the fact that he felt well enough four months after the accident in Leghorn to apply for another berth as chief engineer, that he was found fit for duty at the time, and that symptoms thereafter did not manifest themselves until another four months had elapsed, it would appear that he was, in large measure, restored to the physical condition which existed prior to his joining the Hobson, or at least that he was restored as close to such condition as would be allowed by the fact that he had an uncured heart condition pre-existing the accident. It may be that libellant's illness from 1946 can be regarded as a continuation of the condition manifesting itself during his service on the Few. However, the present libel seeks maintenance and cure based on his earlier service on the Hobson.

■ Even assuming that libellant's present condition is to some extent attributable to aggravation resulting from the 1944 accident, his own proof would require the conclusion that he is not entitled to maintenance and cure under the present libel. Dr. Power, his medical expert, testified that he was totally and permanently disabled in April, 1948. In Farrell v. United States, supra, the Supreme Court held that the liability for maintenance and cure does not extend beyond the time when the maximum cure possible has been effected, and that there is no right to maintenance so long as disability lasts or for life. As stated earlier, under the law, libellant's rights are limited to a period running from August, 1949. Dr. Power seems to indicate that maximum cure was effected in April, 1948.

The evidence establishes, however, that an operation was performed in April, 1949, in which libellant's thyroid was re-

moved. He underwent two additional operations in September and December, 1949. These served to give some measure of relief to him. Assuming these operations can be brought within the doctrine that if the illness proves incurable, the duty to provide maintenance and cure extends to a fair time after the voyage in which to effect such improvement in the seaman's condition as may be reasonably expected to result from nursing, care and medical treatment, Calmar S.S. Corp. v. Taylor, supra, even the most liberal construction of a seaman's right to maintenance and cure must limit the right there. Thus from August 31, 1949 to December 16, 1949, deducting the time when libellant was an inpatient at the Marine Hospital, at most he would be entitled to maintenance for 47 days.

The evidence fails to establish, however, a causal relationship between the accident of 1944 and libellant's illnesses from 1946 to the present from which it can be reasonably concluded that the accident was the cause or served to aggravate the illnesses.

The following language of the Supreme Court in Farrell v. United States, supra, 336 U.S. at page 519, 69 S.Ct. at page 711, is applicable to the present case:

"The need of this seaman for permanent help is great and his plight most unfortunate. But as the evidence has afforded no basis for supplying that need by finding negligence, neither does the case afford a basis for distortion of the doctrine of maintenance and cure. This seaman was in the service of the United States and extraordinary measures of relief while not impossible are not properly addressed to the courts."

The libel will be dismissed. Settle decree.

Concurrently with this opinion, appropriate findings of fact and conclusions of law will be filed.