**Onnie M. MACKEY, Plaintiff,**

v.

**NATIONAL STEEL CORPORATION,
Defendant.**

**Civ. A. No. C 66–626.**

United States District Court
N. D. Ohio, E. D.

March 1, 1967.

J. Harold Traverse, Cleveland, Ohio, for plaintiff.

John H. Hanninen, Lucian Y. Ray, McCreary, Hinslea & Ray, Cleveland, Ohio, for defendant.

### MEMORANDUM

WILLIAM K. THOMAS, District Judge.

Plaintiff Mackey, former employee and first assistant engineer of the Great Lakes Steamer Edmund W. Mudge, sued defendant National Steel Corporation, the owner of the vessel, on September 2, 1966 for payment of "maintenance and medical care" and "interest, court costs, and reasonable attorney fees" for the period beginning July 3, 1962. Plaintiff's claim relates to an injury to his

low back, thus described in his complaint:

> On or about June 10, 1960, Plaintiff, in the course of his employment, and pursuant to the orders of his superior officers, was inspecting the blades of the ship's propeller, while standing in a lifeboat in the open waters of Lake Michigan. As he reached over the bow of the lifeboat to strike one of the blades of the propeller with a testing hammer, the lifeboat suddenly lurched in such manner as to severely strain and injure Plaintiff's low back.

Based on the same injury and disability to his low back, plaintiff in 1961 brought an action for damages against the defendant under the Jones Act and the general maritime law of the United States; and he separately brought his libel against the defendant for maintenance and cure.

The damage action came on for jury trial in February 1962. The late Honorable Charles J. McNamee thus instructed the jury on plaintiff's claims:

> Plaintiff claims that he suffered pain in the lower back with numbness in his left leg which extended down to his toes. He claims further that since July 8, 1960, which was the day he left the vessel he has been under constant medical care and treatment; that he is totally disabled from engaging in his former employment as an engineer and that his injuries are permanent.

Judge McNamee directed the jury that it was for them:

> to determine whether the negligence or breach of duty of seaworthiness of the Defendant on June 10, 1960, precipitated a new injury to the Plaintiff, or whether those factors aggravated a pre-existing condition of Plaintiff's back which had become dormant.

On March 1, 1962 the jury awarded plaintiff $150,000, the full amount of his prayer. In answers to written interrogatories the jury concluded that defendant's negligence under the Jones Act, and the lifeboat's unseaworthiness under general maritime law directly caused or contributed to plaintiff's injury.

On July 2, 1962 plaintiff consented to a reduction of the verdict of $150,000 to $105,000. Defendant paid the reduced sum to the plaintiff. As part of the settlement, plaintiff dismissed his 1961 libel for maintenance and cure. The stipulation of dismissal, dated July 2, 1962, waived "the right to recovery of any maintenance and cure up to the date hereof but without prejudice to any claim of the libellant for maintenance and cure in the future."

The contentions of the parties, conflicting in the pleadings, emerged more clearly during the trial and oral argument. Admitting that the defendant paid maintenance and medical care to July 3, 1962, the plaintiff claims maintenance and cure since that date. He alleges that he "has been obliged to secure medical care and treatment in the form of therapy." He sues principally for $785.60, the cost of services rendered by Dr. A. Irvin Wells, licensed mechanotherapist and chiropractor of Conneaut, Ohio, from July 9, 1962 to December 31, 1966. For the same period he seeks maintenance—1642 days at $8.00 a day, totaling $13,136.

Not arguing that maintenance and cure may exceed maximum cure, plaintiff asks that the term "maximum cure" be given a humanitarian interpretation. Plaintiff urges that Dr. Wells' physiotherapy treatment is improving the condition of his low back. The treatments also are justifiable cure, he says, because the treatments are approved by his orthopedic surgeon, Dr. Euliano of the Fortune Clinic, Erie, Pennsylvania.

Defendant argues that by July 2, 1962, plaintiff had reached the point of maximum cure except for any cure possible from a surgical spinal fusion of the vertebrae of plaintiff's low back, which plaintiff declines to undergo. Defendant urges that while plaintiff may be receiving temporary relief from repeated physiotherapy, these treatments are not

really improving his low back. Actually, it is contended, plaintiff's low back is deteriorating and plaintiff is permanently and totally disabled.

The rule of "maximum cure" needs to be emphasized in pertinent terms. In Calmar S. S. Corp. v. Taylor, 303 U.S. 525, 58 S.Ct. 651, 82 L.Ed. 993 (1938), the Supreme Court recognized the "ancient duty of a vessel and her owner to provide maintenance and cure for seaman injured or falling ill while in service." The court there upset a lump sum award for life for maintenance and cure of a seaman, suffering from Buerger's disease, deemed incurable, "which manifests itself during his employment, but is not caused by it." Holding that " 'cure' is care, including nursing and medical attention during such period as the duty continues," the court thus stated the measure of recovery:

The seaman's recovery must therefore be measured in each case by the reasonable cost of that maintenance and cure to which he is entitled at the time of trial, including, in the discretion of the court, such amounts as may be needful in the immediate future for the maintenance and cure of a kind and for a period which can be definitely ascertained. Id. at 531–532, 58 S.Ct. at 655.

The nature and extent of maintenance and cure again came before the Supreme Court in Farrell v. United States, 336 U.S. 511, 69 S.Ct. 707, 93 L.Ed. 850 (1949). Permanently and totally injured in the Palermo, Sicily port area during World War II, Farrell, a merchant seaman on a government owned cargo vessel, sued the United States for maintenance and cure. Returning to his ship after overstaying shore leave he lost his way and fell into a drydock.

The injuries left him "totally and permanently blind" with "post-traumatic convulsions which probably will become more frequent and are without possibility of further cure." It was noted that medical care would be required from time to time "to ease attacks of headaches and epileptic convulsions." In ruling that such medical care was not warranted cure, the Supreme Court held:

The liability for maintenance and cure does not extend beyond the time when the maximum cure possible has been effected, and petitioner is not entitled to maintenance so long as he is disabled or for life. Id. at 511, 69 S.Ct. 707. (syl. 1)

In Vaughan v. Atkinson, 369 U.S. 527, 82 S.Ct. 997, 8 L.Ed.2d 88 (1962), the Supreme Court upheld the right to maintenance even though economic necessity forces a disabled seaman to work, and permitted counsel fees "on the record in this case."

In the course of his majority opinion, Justice Douglas restated the bounds of maintenance and cure in these words:

Maintenance and cure is designed to provide a seaman with food and lodging when he becomes sick or injured in the ship's service; and it extends during the period when he is incapacitated to do a seaman's work and continues until he reaches maximum medical recovery. Id. at 531, 82 S.Ct. at 1000.

Also in 1962 in Salem v. United States Lines Co., 370 U.S. 31, 82 S.Ct. 1119, 8 L.Ed.2d 313 (1962), the Supreme Court on the authority of Calmar, supra, affirmed the Court of Appeals for the Second Circuit which court, in setting aside an award of future maintenance, had said:

There does not appear to be any sufficient basis, by opinion evidence or otherwise, for the finding that three years is the period reasonably to be expected for Salem to reach maximum improvement. Salem v. United States Lines Co., 293 F.2d 121, 125 (2d Cir. 1961), affd., 370 U.S. 31, 82 S.Ct. 1119, 8 L.Ed.2d 313 (1962.)

■ Thus it is seen that the Supreme Court limits a seaman's right to maintenance and cure to "maximum cure." Equivalents are "maximum medical recovery," or "maximum improvement."

■ It is suggested that the plaintiff's right to maintenance and cure may

be greater since in the damage action the jury determined his low back injury was caused by Mackey's employment (in the lurch of the lifeboat). *Farrell*, supra, is interpreted as settling the point that the rights and duties of maintenance and cure are measured the same, without variance in nature or extent, regardless of whether the maintenance and cure is owed (1) to a seaman, suffering from a disease in the service of the ship "which manifest[ed] itself during his employment but [was] not caused by it," Calmar, supra, 303 U.S. at 530, 58 S.Ct. at 654, or (2) to a seaman whose injury occurs in the service of the ship but may not be caused by his employment, as in Aguilar v. Standard Oil Co., 318 U.S. 724, 63 S.Ct. 930, 87 L.Ed. 1107 (1943) and in Farrell, supra, or (3) to a seaman whose incapacity (disease or injury) is caused "by his employment" in the service of the ship.

It is claimed that when the Court reserved or disclaimed any judgment as to cases where the incapacity is caused "by the employment" or "by the seaman's service" it recognized or created such cases as a separate class for a different measure of maintenance and cure. We think no such distinction exists or was premised in the *Calmar* case. * * * Aside from gross misconduct or insubordination, what the seaman is doing and why and how he sustains injury does not affect his right to maintenance and cure, however decisive it may be as to claims for indemnity or for damages for negligence. He must, of course, at the time be "in the service of the ship," by which is meant that he must be generally answerable to its call to duty rather than actually in performance of routine tasks or specific orders. * * *

For any purpose to introduce a graduation of rights and duties based on some relative proximity of the activity at time of injury to the "employment" or the "service of the ship," would alter the basis and be out of harmony with the spirit and function

of the doctrine and would open the door to the litigiousness which has made the landman's remedy so often a promise to the ear to be broken to the hope. Farrell, supra, 336 U.S. at 515–516, 69 S.Ct. at 709.

■ In an action for damages because of negligence under the Jones Act or because of unseaworthiness under the general maritime law, a seaman may recover as part of his damages the reasonable cost of future medical care and attention, which with reasonable certainty will be necessitated by his injuries. Bartholomew v. Universe Tankships, Inc., 279 F.2d 911 (2d Cir. 1960).

■ *Farrell*, supra, demonstrates and defines a different measure of damages in an action for maintenance and cure. Seaman Farrell needed medical care from time to time "to ease attacks of headache and epileptic convulsions." Though necessitated by his injuries suffered in the service of the ship, a requisite for compensable cure, Farrell's intermittent medical care did not qualify as compensable cure because it served only to ease his condition, while producing no lasting improvement. To show that his ship service-connected incapacity has not yet reached the level of maximum cure, i. e., maximum medical recovery or improvement, it is concluded that the seaman must prove that the medical care and attention has produced or is likely to produce some lasting medical recovery or improvement in his condition.

Hewing to these rules the evidence will be studied to resolve plaintiff's claim for maintenance and cure since July 2, 1962.

Plaintiff testified that as his vessel was departing the Port of Milwaukee on June 10, 1960, it was halted to permit an inspection of the propeller. Plaintiff and others were designated to examine the propeller nuts from an open lifeboat. As he leaned over the gunwhale, tapping the nuts with a hammer, the lifeboat lurched. Plaintiff felt a "snap" in his back and a "sharp pain right away." Severe ache went down his back, with

numbness down his left leg. After two further trips he got off at Buffalo on July 8, 1960. Between July 11, 1960 and July 26, 1961 he was periodically examined and given physiotherapy at the Fortune Clinic in Erie, Pennsylvania.

In July 1962 (the beginning date of the present claim for maintenance and cure) plaintiff says he was "still having difficulty and pain" in his back and down his left leg. He says that if he walked "it would get numb * * * and I wouldn't walk too far of a distance." Asked as to the effect, he said "I would limp and have to favor my other leg." Because of pain in the hip joint, he could not lie in bed on his left side.

Continuously since December 1961 he has been receiving physiotherapy treatments from Dr. A. Irvin Wells, a licensed mechanotherapist and chiropractor of Conneaut, Ohio. The yearly total and cost of these treatments between July 2, 1962 and December 31, 1966 are tabulated:

From 7/9/62 through 12/31/62—23 treatments
at $4.00 each, plus medicines ...............................$104.36
1963—38 treatments, at $4 each plus medicines ............. 160.24
1964—47 treatments, at $4 each .......................... 188.00
1965—39 treatments, at $4 each, plus X-rays ................ 168.00
1966—33 treatments, at $5 each .......................... 165.00

Total ........$785.60

---

Plaintiff states that in the past two years he could feel gradual improvement. His back has improved "a little not much, but my legs have improved a lot." He can walk without a limp and can lie on his left side, "without having any trouble with my hip joint." He still wears a back brace and "there is still weakness in * * * lower part of the back." Asked what work he has done since June 10, 1960, he answered: "no more than just keep the house and do my own cooking, cleaning the house." As to any relapses during the five years, he said he had "cramps in my leg." Dr. Wells worked on them "for close to two years" with ultrasound. As a result he has been "feeling fairly good again now."

When he first examined the plaintiff, Dr. Wells stated that the plaintiff was "suffering continual low back pain that radiated down the left leg." He was hampered in walking and took a "hesitant step with the left leg." Pain at times caused cramping "particularly in the calves of both legs." During 1965, Dr. Wells testified, he X-rayed the plaintiff's back and found "a compensating change taking place" in the "position of the pelvis." Because of the slow progress, he changed the manipulative procedure. After this change, "improvement began to show itself a little faster."

By the end of 1965, he stated, improvement was enough to warrant continuation of the treatment; the improvement he noted was the plaintiff's ability to handle himself, to walk, and stand longer. The almost continuous pain in the left leg had by this time ceased. The disability and pain in the low back was still evident. The radiating pain down the left leg had stopped. The disability of having "to throw the leg in order to walk" had changed.. He would walk "almost normally." Dr. Wells says that in 1966 he "began to stretch out the length of the treatments because of the gradual improvement that was taking place."

Analysis of the improvement in plaintiff's condition, thus testified to by the plaintiff and Dr. Wells, turns to the past history of plaintiff's low back. Dr. Clayton W. Fortune's deposition, taken

February 8, 1962 in the plaintiff's Jones Act case, and used by agreement in this case, details plaintiff's condition on each of his visits to Dr. Fortune's clinic (known as the Fortune Clinic) during an 11-year period beginning July 24, 1950. Associated with Dr. Fortune were Dr. Rimmer, Dr. Lehan, and Dr. Euliano, all orthopedic surgeons. Dr. Fortune is now deceased. Of these doctors only Dr. Euliano is now connected with the Clinic. The plaintiff was examined at the Fortune Clinic on the following dates, and treatment was prescribed by one or another of the foregoing orthopedic surgeons. On some of the dates physiotherapy treatments were given to the plaintiff:

> July 24, 1950; May 17, 1951; June 27, 1957 and 11 other occasions through October 1957; January 9 and 30, February 21, and March 14, 1958; March 9, 13, 24, 27, and 30, 1959; July 11 and 18, August 1, 16, and 23, September 6, October 5, November 2 and 16, and December 7, 1960; and February 8, April 6 and 26, May 31, and July 26, 1961.

Referring to Dr. Fortune's deposition, and his quotes from Clinic records, on July 24, 1950 the diagnosis was "unstable back." A back brace was recommended. A note on May 17, 1951 reads: "A painful lower back with a left sciatica which apparently has been bothering him for two years." The records of that date add: "His back and leg symptoms are definitely increased by activity and during the past year has been more or less constant. With activity, particularly walking, he developed numbness and increased pain in the left leg."

The plaintiff consulted Dr. Lehan on June 27, 1957 "on account of some residual pain and numbness in the lower back and left leg." The same entry reveals that in 1951 in Cleveland, Dr. Elkins performed surgery. "A disc or two were removed," and in 1952 after reinjury and a recurrence of symptoms he was re-operated on by Dr. Elkins on August 18, 1952. (In other testimony in the damage action the report of Cleveland's Lutheran Hospital, where Dr. Elkins performed the surgery, disclosed that in the 1951 and 1952 operations the pre-operative diagnosis was herniated intervertebral disc, while the post-operative diagnosis was negative. Scar tissue was removed in the second operation.) Dr. Lehan's notes go on to say that:

> Following this he returned to gainful work as an engineer in 1953 and worked with only very little difficulty from that time up until May 21, 1957 when he slipped on a wet oily deck, landing on his left hip and since that time had developed pain and numbness in his left leg.

A note dated April 18, 1958 reads:

> This patient is still having some back pain and achiness in his left leg. He is desirous of returning to his former occupation when the season opens on the Great Lakes, but I have warned him, in view of his symptomatology he should be careful about doing heavy lifting.

The March 30, 1959 entry reads:

> He has been asked to report to duty on a ship around the first of April. He still complains of intermittent leg pain and back pain.

Following the lifeboat occurrence of June 10, 1960 plaintiff was examined on July 11, 1960 by Dr. Rimmer. Dr. Rimmer records that "Mr. Mackey was complaining of pain in the lumbar spine, that is, the lower back, with numbness intermittent in character in his left leg."

As in 1957, 1958, and 1959 the plaintiff received physiotherapy treatments (galvanic current and exercises) on his visits to the Fortune Clinic in 1960 and 1961. On February 8, 1961 and on April 5, 1961 Dr. Lehan found: "½ inch of atrophy of both the left thigh and calf, diminishing sensation in the medial side of the calf, and absence of the left heel cord." Similarly on July 24, 1950 (the plaintiff's first visit to the Fortune Clinic), Dr. Lehan found

that "the left heel cord reflex was retarded and there was diminished sensation present on the lateral aspect of the left thigh and also the entire left foot."

Dr. Fortune's entry on April 26, 1961 noted that:

he * * * is complaining chiefly at the present time of stiffness in the lower back, pain which radiates down the left leg, particularly to the calf, at times it also runs into the foot. All of these symptoms are aggravated by any type of activity, particularly on standing, walking, relieved somewhat by rest.

He added:

From what I can see on examination and from going over the office records, there has been no improvement whatsoever during the past eight or 10 months, and for that reason I feel that a continuation of the present therapy is of little value.

On May 31, 1961 Dr. Fortune told the patient he "saw no reason to continue with further therapy which apparently was not helping him." It was the doctor's opinion that the:

patient still has a lot of disability. For his particular work, that is the work he had been formerly employed at, I considered him totally disabled * * * I also advised him to continue with the exercises and continue with the back support if it relieved him. I also felt he could get relief by surgical treatment but I could not guarantee that procedure.

Dr. Fortune saw the plaintiff for the last time on July 26, 1961. He observed:

After examination as of that time I found actually no change in physical examination and my opinion remained the same as was rendered in May of this year. I felt the patient had a very definite residual industrial disability. I felt it likely to be relieved by surgical treatment. No other treatment, in my opinion, would be of any help.

The Fortune Clinic records thus reveal that prior to June 10, 1960 and since as early as 1950 the plaintiff has had an unstable low back. He has had recurring episodes of pain, stiffness, and disability in the lumbosacral area. Intermittently he has suffered radiating pain and numbness in his left leg and foot. Since June 10, 1960, when his low back was reinjured in the lurching lifeboat, the low back symptoms have been constant, painful and totally disabling. Of similar character at least through 1964 were the radiating pains and numbness in his left leg.

Considering the history of plaintiff's low back it is likely, and it is so found, that any cessation of radiating pain in plaintiff's left leg, and any increased freedom of movement in this limb, within the years 1965 and 1966 is a remission and not a permanent improvement.

The verdict and the jury's findings in plaintiff's previous Jones Act case, under the trial court's statement of the issues, have adjudicated that the plaintiff "suffered pain in the lower back with numbness in his left leg which extended down to his toes," totally disabling him since July 8, 1960. In this case plaintiff claims "total disability involving the use of his lower back." Consistently, plaintiff's present testimony must and will be construed as describing no more than a remission of recurring but intermittent left leg symptoms.

A note in the Fortune Clinic records, dated May 17, 1951, states: "with activity, particularly walking, he developed numbness and increased pain in the left leg." Ten years later, on April 26, 1961, after referring to the plaintiff's complaints of radiating pain in the left leg, Dr. Fortune noted, "All of these symptoms are aggravated by any type of activity, particularly on standing, walking, relieved somewhat by rest." The plaintiff said the same thing in his own way when he testified in his Jones Act case:

Q. What does activity or the lack of activity do so far as your back condi-

tion is concerned. Supposing you use your back and body in doing things, what happens then?

A. I can't stand it.

Dr. Wells, in his testimony, agrees too that: "Activity would increase the symptoms."

During 1962, 1963, and 1964, Dr. Wells' weekly physiotherapy produced no improvement in the plaintiff's condition, the evidence shows. Dr. Wells states that in 1965 after his X-rays revealed a compensating change in the position of plaintiff's pelvis he altered the manipulative phase of his four-stage therapy (deep heat, short wave diathermy, manipulative procedure, and electric sine wave current to stimulate muscles and leg action). Slow improvement thereafter was observed. The undescribed change in the manipulative procedure and its unexplained effect on the undisclosed compensation in the position of plaintiff's pelvis lack probative value.

In view of the unanimous testimony that activity increases the plaintiff's symptoms it is likely, and it is so found, that plaintiff's long inactivity, other than to cook and to keep house, probably accounts for any recent cessation in his leg symptoms. Any improvement in the plaintiff's use and movement of his limbs is not proved to be due to Dr. Wells' 1965 change in his manipulation of the plaintiff's back.

In any event, it is evident from the testimony of the plaintiff and Dr. Wells that the physiotherapy treatments, while relieving the symptoms and easing his discomfort for a time, actually produce no lasting improvement in plaintiff's condition. Thus the plaintiff testified:

Q. Did the symptoms in your back return and become just as acute a certain period of time after you had one of these physiotherapy treatments?

A. At times, yes.

Dr. Wells testified to the same effect:

Q. And as I understand those intervals of time were spaced so that when the symptoms returned you would relieve them again; is that right?

A. When the symptoms returned that would be to relieve them again; right.

The yearly total of Dr. Wells' physiotherapy treatments was 38 in 1963, 47 in 1964, 39 in 1965, and 33 in 1966. The fact that there were six fewer treatments in 1966 than in 1965 reflects a lessened need for physiotherapy in 1966. Even so, 33 treatments still represent frequent physiotherapy. This repetition of therapy manifests temporary, not permanent improvement in the plaintiff's physical condition; as does the notation of a new appointment on each of Dr. Wells' treatment receipts. Thus, the receipt for December 27, 1966 states "Your next appointment is on 1–9–67 at 12:45."

Plaintiff argues that Dr. Wells' physiotherapy is compensable cure because it was first directed by Dr. Fortune and recently by Dr. Euliano. Plaintiff's testimony tends to show that he switched physiotherapy from the Fortune Clinic to physiotherapy in Conneaut, Ohio with the consent, if not the direction, of Dr. Fortune. Dr. Fortune's testimony differs. On May 31, 1961 Dr. Fortune's entry read:

It was my opinion as of that time, and I so told the patient, that I saw no reason to continue with further therapy which apparently was not helping him.

Similarly, when he last saw the plaintiff on July 26, 1961, Dr. Fortune in referring to the plaintiff's disability, noted:

I felt it likely to be relieved by surgical treatment. No other treatment, in my opinion, would be of any help.

Plaintiff's claim that Dr. Fortune directed Dr. Wells' treatment is further disputed by the gap of five months between the plaintiff's last visit to the Fortune Clinic on July 26, 1961 and his first visit to Dr. Wells in December 1961. Also, it is significant that Dr. Wells received no medical order to treat the plaintiff. The relevant evidence re-

quires a finding that Dr. Wells' administration of physiotherapy to the plaintiff was initiated by the plaintiff and was not directed by Dr. Fortune.

Recent approval for Dr. Wells' physiotherapy is attributed to the statement of Dr. John J. Euliano, senior orthopedic surgeon at the Fortune Clinic. The report of his examination of Onnie M. Mackey on December 12, 1966 concludes:

I would advise that he continue with intermittent therapy as he has in the past.

However, Dr. Euliano's report previously states: "He is taking therapy because it relieves his symptoms."

Similarly, in his report of his examination of Onnie M. Mackey on February 18, 1966, Dr. Euliano states:

It would be my opinion that the patient should continue with therapy to the lower lumbar region, inasmuch as he receives some temporary relief from the use of these.

Thus Dr. Euliano's opinion corroborates this court's earlier finding that Dr. Wells' continuing physiotherapy is not producing lasting improvement in the plaintiff's condition, although it does give him some temporary relief from his low back symptoms.

In his report of February 18, 1966 Dr. Euliano observes that the patient:

Has continued to take treatment from Dr. Wells in Conneaut, Ohio, a physiotherapist. He states that this therapy has been advised [by] his family physician, Dr. De Cato of Ashtabula, Ohio. He states that he feels better after his treatments.

Plaintiff did not testify that Dr. De Cato advised the therapy. However, neither Dr. De Cato's advice, if true, nor Dr. Euliano's retrospective approval of the physiotherapy is sufficient alone to establish a right to recover the cost of Dr. Wells' therapy. A previous conclusion of law requires more than medical approval of therapy or Dr. Euliano's belief that the therapy is "definitely causally connected from a medical standpoint with the injury which the patient had in 1960." In addition, the evidence must establish that the plaintiff has not yet reached maximum medical recovery or improvement.

Dr. Euliano in his report of February, diagnoses plaintiff's lumbosacral instability as "discogenic disease and superimposed injury of 1960." As neurological corroboration, Dr. Euliano found, and as plaintiff's physical examinations repeatedly have revealed, "½ inch atrophy in the left calf. The left heel cord reflex was slightly retarded."

Uncontradicted X-ray findings bear out Dr. Euliano's diagnosis of "discogenic disease." X-rays taken in 1967, as in 1962, reflect continued narrowing between the 5th lumbar vertebra and the first sacral segment. But Dr. Robert J. Roehm, orthopedical surgeon who examined the plaintiff for the defendant, found in January 1967, unlike in 1962, that:

There has been narrowing of the disc space between the 4th and 5th lumbar vertebrae, which to us indicates a degenerative disc disease with absorption of the disc material between the vertebrae, thereby allowing it to settle or to narrow.

Dr. Wells states that his "treatment can slow and also halt the degeneration." He adds:

It can maintain a static condition. It depends on the response of the body, again, and its ability to compensate and keep this disc from degenerating.

Radiological proof requires the conclusion that despite Dr. Wells' physiotherapy, plaintiff's lumbar spine is not improving, but deteriorating.

Radiological proof supports Dr. Euliano's further opinion that the patient has "at least a 60% permanent residual disability." Similarly, Dr. Wells estimated the plaintiff's overall disability as 60 per cent, though he believes that recent increased movement in the plaintiff's limbs represents a decrease in disability of six to eight per cent.

When the plaintiff was examined by Dr. Euliano on February 18, 1966 it was his opinion:

> that the only type of definitive treatment that might result in rehabilitating this patient would be a pantopaque myelogram study of the lower lumbar region, to be followed by a Knodt type of posterior lumbar fusion. Even after this procedure, there would be a high degree of residual disability.

Again in his report of December 12, 1966, Dr. Euliano states:

> Ideally, a pantopaque myelogram study of the lower lumbar region with a posterior lumbar fusion would be indicated but because of his age, even if this surgery was done it is very probable that he would not be able to return to unrestricted type of work.

Dr. Norman J. Rosenberg, Cleveland orthopedic surgeon, who examined the plaintiff and testified on his behalf in the Jones Act trial, recommends a spinal fusion and so do Drs. Fortune, and Roehm. As Dr. Rosenberg put it:

> All of the conservative measures have been tried, and then we have to go to something surgical for relief.

Plaintiff's counsel asked him:

> Can you state with reasonable certainty, that if he had a spinal fusion he would be restored to the condition his back was in before he had this trouble?

He answered:

> I would hope—he would not be restored to that condition. The purpose is to prevent motion in this area (indicating). I would not promise him anything about the condition in which he might be after a spinal fusion. I would expect that he would be improved.
>
> Q. What about—that would be in the event the spinal fusion is successful?
>
> A. Yes, sir.
>
> Q. Supposing it proved unsuccessful? What would be the situation then.
>
> A. Probably essentially as it is now.

Time has indicated that the surgery to the plaintiff's low spine in 1951 and 1952 did not end his low back pain and disability. Understandably the plaintiff hesitates about submitting to further back surgery. He wants a guarantee of at least 50 per cent chance of success. Dr. Rosenberg says he "would not promise him anything about the condition in which he might be after a spinal fusion." Nor will any other competent orthopedic surgeon guarantee success. Yet all the orthopedic surgeons agree with Dr. Euliano that "the only type of definitive treatment that might result in rehabilitating this patient, would be a pantopaque myelogram study of the lower lumbar region, to be followed by a Knodt type of posterior lumbar fusion."

 Upon all the evidence it is decided and found that by July 2, 1962, the plaintiff reached a point of maximum cure, that is, maximum medical recovery and improvement, except for the possibility of a future lumbar spinal fusion. Though under other circumstances physiotherapy may be justifiable cure, Dr. Wells' physiotherapy, rendered the plaintiff since July 2, 1962, is not so compensable, it being found that this medical care and attention has not produced lasting improvement in the plaintiff's condition.

It is concluded that plaintiff's declination to proceed with a spinal fusion does not foreclose or terminate any future right to be compensated for such surgical treatment. However, the plaintiff's refusal to undertake a type of cure which offers the possibility of achieving some lasting improvement to his back, though excusable, does not render as compensable cure medical care and attention to his back which demonstrably does not give lasting improvement.

Having ruled against the right of reimbursement for the physiotherapy treatments received since July 2, 1962, plaintiff's claim for maintenance during the same period—$13,136.00 (1642 days at $8 a day)—necessarily must also be denied. Maintenance is not a separate right, independent of the right to medical care and attention. It is determined that the plaintiff has reached a point of max-

imum cure, except for possibility of a future spinal fusion. The plaintiff's claim for maintenance falls with his claim for cure.

Reimbursement for Dr. Wells' past treatments would pave the way for plaintiff indefinitely to claim future physiotherapy, coupled with maintenance without end, contrary to the admonition that a seaman is "not entitled to maintenance so long as he is disabled or for life," Farrell, supra, 336 U.S. at 511, 69 S.Ct. 707. The law of maintenance and cure, humanitarian though its purposes are, should be construed justly as well as generously.

With the denial of plaintiff's claim for maintenance and cure, plaintiff's derivative claim for counsel fees cannot and will not be considered. Accordingly, the foregoing findings of fact and conclusions of law require rendition of judgment against the plaintiff and for the defendant.