**Opinion issued August 26, 2014**



In The

# Court of Appeals

For The

# First District of Texas

————————————

## NO. 01-13-00092-CV

————————————

## AUGUSTA BARGE COMPANY, Appellant

## V.

## FIVE B'S, INC., Appellee

———————————————————————————————————

**On Appeal from the 212th District Court**
**Galveston County, Texas**
**Trial Court Case No. 07-CV-0920**

———————————————————————————————————

## MEMORANDUM OPINION

Appellant, Augusta Barge Company ("Augusta"), challenges the trial court's

judgment, entered after a trial to the court, in favor of appellee, Five B's, Inc.

("Five B's"), in Five B's suit seeking contribution from Augusta for maintenance

and cure expended to a deckhand after a towboat collision. In two issues, Augusta

contends that the evidence is legally and factually insufficient to support the trial court's allocation of fault and its finding that Five B's is "entitled to reimbursement of future maintenance and cure."

We affirm.

## Background

Captain L. Edwards testified that at approximately 5:30 a.m. on July 6, 2007, he piloted the *Murray L II* ("*MLII*"), a towboat owned by Augusta, through the Leland Bowman Lock in the Intracoastal Waterway in Louisiana. He noted that the *MLII* had been experiencing various mechanical problems for several days: its engines had stopped running and had to be repaired, and its port rudder had been "knocked off" when the vessel had run aground. As the *MLII* passed through the lock, it again experienced engine problems. Edwards steered the *MLII*, which was underway without barges or tow, into the bank of the waterway, and he engaged the engines to hold it in place for repairs. Edwards then left the wheelhouse and went below to the engine room to assist the crew. He did not tie the *MLII* to the nearby pilings, appoint a lookout, or take a radio with him.

Captain L. Walker testified that on the morning of July 6, 2007, he piloted the *Captain Les Barrois* ("*Capt Les*"), a towboat owned by Five B's, through the Leland Bowman Lock, pushing two empty barges. As he headed east through the waterway, he saw the *MLII* ahead at the bank. At the back of the *MLII*, he noted

2

"wheel wash," which indicated that its engines were running.  Moments later, he saw the *MLII* move away from the bank and into the center of the waterway toward his barges.  Walker attempted to contact the *MLII* by radio and beacon, but did not receive any response.  When the *MLII* was approximately eighty feet away, it began running parallel with the *Capt Les*.  Thinking that the wheelhouse of the *MLII* was manned, and noting that the boats were maintaining a safe distance, Walker maintained his course.  He continued to try to communicate with the *MLII* by radio and beacon to coordinate passing or overtaking, but the crew of the *MLII* did not respond.  Rather, it increased its speed and began to overtake and pass the *Capt Les*.  Suddenly, the *MLII* changed course, turned almost ninety degrees, and crossed in front of the lead barge being pushed by the *Capt Les*.  Walker attempted to avoid a collision by reversing engines.  But the *MLII* collided with the lead barge, the bow of the barge momentarily rode up over the bow of the *MLII*, and both vessels stopped.

Douglas Gay, a Five B's deckhand on the *Capt Les*, testified that at the time of the collision, he was in the engine room, standing on one foot as he pulled off his slicker suit, and he "slammed" back into a handrail, injuring his back.  He got up and went to the wheelhouse, where Captain Walker was "still trying to get ahold of" anyone on the *MLII* over his radio.  Hours later, Gay reported that he had suffered an injury to his back during the collision.  Subsequently, Five B's

3

began paying Gay for "maintenance and cure,"[1] and he underwent back surgery. Gay then sued Five B's under the Jones Act and general maritime law, seeking recovery for maintenance and cure, negligence, and unseaworthiness. And he sued Augusta for negligence. Five B's cross-claimed against Augusta for contribution or indemnification.

Captain G. Nichols, a Five B's maritime expert witness, testified that Captain Walker kept "a proper lookout," saw the *MLII*, and monitored it. Nichols explained that when Walker saw the *MLII* coming toward his barge, he maneuvered to try to avoid a collision. And when the *MLII* began to go under the bow of the barge, Walker maneuvered to avoid hitting the wheelhouse and capsizing the *MLII*. Nichols opined that the collision was caused by Captain Edwards's failure to tie the *MLII* to the pilings and maintain a lookout or monitor the radio, which he asserted violated certain federal regulations.[2] Nichols testified that the *Capt Les* had the right-of-way, Walker's "actions were proper under the circumstances," neither Walker nor Five B's "had any fault in the collision," and the "sole cause of the collision" was the *MLII* coming off the bank.

Captain J. Sutton, Augusta's maritime expert witness, opined that Captain Walker failed to perceive the risk as the *MLII* approached and, not knowing the

---

[1] "Maintenance and cure entitles a seaman who is injured or becomes ill while in the service of a ship to food, lodging, and necessary medical services." *Maritime Overseas Corp. v. Waiters*, 917 S.W.2d 17, 18 (Tex. 1996).

[2] *See* 33 C.F.R. §§ 83.05, 83.17, 162.75 (2013).

4

*MLII*'s intentions or successfully reaching the *MLII*'s crew via radio or beacon, failed to "blow the danger signal." Sutton further opined that it was "impossible" for the *MLII* to have made the sudden turn that Walker described and, thus, the *MLII* must have instead drifted out into the middle of the canal, where Walker should have seen it. Although he agreed that Captain Edwards should not have left the wheelhouse of the *MLII*, Sutton explained that he did so, in regard to making repairs, because he was most knowledgeable man on board.

Ajay Bindal, M.D., testified that after the collision, he treated Gay for his back injury. He opined that Gay had a spinal defect, known as spondylolysis, that was caused or exacerbated by the collision and necessitated spinal fusion surgery, which he undertook in June 2008. Bindal noted that Gay had not yet reached Maximum Medical Improvement ("MMI"), a second surgery might be necessary, and he would be in pain for the rest of his life. He explained that Gay would, based on reasonable medical probability, require medical treatment in the future, namely, "doctor visits, pain medication, imaging studies, [and] possible therapy" at a cost of "$3,000 a year, each year, for the rest of his life." And Gay would reach MMI "hopefully, in the next six months" (after Bindal's October 2008 deposition).

James Yeager, Five B's expert economist, testified that the then present value of Gay's future medical costs ranged from $90,000 to $186,164, depending on whether Gay needed a second surgery. Yeager calculated future maintenance

5

based on Bindal's estimate of $20.00 per day for six months, through April 2009. And he calculated "future medical expenses" using Bindal's estimate of $3,000 per year for the duration of Gay's life expectancy.

In 2009, after Five B's had paid Gay $69,241.08 in past maintenance and cure, Gay settled with Five B's for an additional $115,000, which was divided into $25,000 for Gay's Jones Act claim and $90,000 for Gay's future maintenance and cure. And Gay non-suited Five B's and Augusta.

The trial court found that Augusta was seventy-five percent at fault for causing the collision, Five B's was twenty-five percent at fault, and the total maintenance and cure incurred by Five B's was $159,241.08, including $69,241.08 paid before settlement and $90,000 paid to settle Gay's future maintenance and cure claim. The trial court ordered that Five B's recover from Augusta a total of $119,430.81 in reimbursement for maintenance and cure, plus interest and costs. And it issue findings of fact and conclusions of law.

**Standard of Review**

In an appeal from a judgment rendered after a bench trial, the trial court's findings of fact have the same weight as a jury's verdict, and we review the legal and factual sufficiency of the evidence used to support them, just as we would

6

review a jury's findings.[3]  *Catalina v. Blasdel*, 881 S.W.2d 295, 297 (Tex. 1994). In conducting a legal sufficiency review, we consider all of the evidence in the light most favorable to the verdict and indulge every reasonable inference that would support it.  *City of Keller v. Wilson*, 168 S.W.3d 802, 822 (Tex. 2005). In determining whether legally sufficient evidence supports the finding under review, we must consider evidence favorable to the finding if a reasonable fact finder could consider it, and disregard evidence contrary to the finding unless a reasonable fact-finder could not disregard it.  *Id*. at 827; *Brown v. Brown*, 236 S.W.3d 343, 348 (Tex. App.—Houston [1st Dist.] 2007, no pet.).  When a party attacks the legal sufficiency of an adverse finding on which it did not have the burden of proof, it must demonstrate that there is no evidence to support the adverse finding. *Croucher v. Croucher*, 660 S.W.2d 55, 58 (Tex. 1983); *Bellino v. Comm'n for Lawyer Discipline*, 124 S.W.3d 380, 385 (Tex. App.—Dallas 2003, pet. denied). We will sustain a legal-sufficiency or "no evidence" challenge if the record shows one of the following: (1) a complete absence of evidence of a vital fact, (2) rules of

---

[3]    Five B's urges us to apply state legal and factual sufficiency standards of review. Augusta does not present any standards of review for us to apply; however, in its reply brief, it states that it takes no issue with the standards urged by Five B's.  We note that the Jones Act applies to employees seeking damages from their maritime employers, not to maritime employers seeking damages from third-party tortfeasors, as here.  *See* 46 U.S.C. § 30104 (2006); *Marine Transp. Corp. v. Methodist Hosp.*, 221 S.W.3d 138, 147 (Tex. App.—Houston [1st Dist.] 2006, no pet.); *see also Maritime Oveseas Corp. v. Ellis*, 971 S.W.2d 402, 406–07 (Tex. 1998).

7

law or evidence bar the court from giving weight to the only evidence offered to prove a vital fact, (3) the evidence offered to prove a vital fact is no more than a scintilla, or (4) the evidence establishes conclusively the opposite of the vital fact. *City of Keller*, 168 S.W.3d at 810.

In conducting a factual-sufficiency review, we review all of the evidence in a neutral light and will reverse only if the evidence supporting the finding is so weak or the finding is so against the great weight and preponderance of the evidence that it is clearly wrong or manifestly unjust. *See Dow Chem. Co. v. Francis*, 46 S.W.3d 237, 242 (Tex. 2001); *Plas–Tex, Inc. v. U.S. Steel Corp.*, 772 S.W.2d 442, 445 (Tex. 1989). In a bench trial, the trial court is the sole judge of the witnesses' credibility, and it may choose to believe one witness over another; a reviewing court may not impose its own opinion to the contrary. *See Golden Eagle Archery, Inc. v. Jackson*, 116 S.W.3d 757, 761 (Tex. 2003); *Zenner v. Lone Star Striping & Paving L.L.C.*, 371 S.W.3d 311, 314 (Tex. App.—Houston [1st Dist.] 2012, pet. denied).

We review a trial court's conclusions of law de novo. *BMC Software Belgium, N.V. v. Marchand*, 83 S.W.3d 789, 794 (Tex. 2002). Although a trial court's conclusions of law may not be challenged for factual sufficiency, we may review the legal conclusions drawn from the facts to determine whether the conclusions are correct. *Id*. If we determine that a conclusion of law is erroneous,

8

but the trial court nevertheless rendered the proper judgment, the error does not require reversal. *Id.*

## Liability

In its first issue, Augusta argues that the evidence is legally and factually insufficient to support the trial court's finding that it is seventy-five percent at fault for Gay's injuries because the "substantial negligence of Captain Walker and Five B's superseded any minor negligence, if any, of Augusta; and as such, was the sole proximate cause of the personal injuries." Augusta further asserts that the evidence is legally and factually insufficient to support the trial court's findings of fact numbers 5, 12, 13, and 14.

"Maintenance and cure are maritime terms describing a seaman's right to receive food and lodging (maintenance) and necessary medical services (cure)." *Liberty Seafood, Inc. v. Herndon Marine Prods., Inc*., 38 F.3d 755, 757 (5th Cir. 1994). It is well-established that a ship owner required to pay maintenance and cure may recover those payments from a third-party who caused, in whole or in part, the employee's injury. *Id*. This right is not extinguished when the ship owner is apportioned part of the fault. *Id.* Further, an employer's right to recover maintenance and cure from a tortfeasor is not extinguished by settlement. *Id.*; *Bertram v. Freeport McMoran, Inc*., 35 F.3d 1008, 1015 (5th Cir. 1994). Rather, a ship owner remains entitled to contribution from the third-party tortfeasor in

proportion to the third-party's fault. *Liberty Seafood, Inc.*, 38 F.3d at 757. To recover damages for maintenance and cure from a third-party tortfeasor, the ship owner must first show that the third party caused injury to the seaman. *Id.*; *Marine Transp. Corp. v. Methodist Hosp.*, 221 S.W.3d 138, 148 (Tex. App.—Houston [1st Dist.] 2006, no pet.).

"When a state court hears an admiralty case, that court occupies essentially the same position occupied by a federal court sitting in diversity: the state court must apply substantive federal maritime law but follow state procedure." *Mar. Overseas Corp. v. Ellis*, 971 S.W.2d 402, 406 (Tex. 1998). In admiralty cases, the trial court's rulings on "negligence, cause, and proximate cause are findings of fact," including the allocation of liability. *Bertram*, 35 F.3d at 1019. Here, the trial court found that Augusta was seventy-five percent at fault for the collision and Five B's was twenty-five percent at fault.

The record shows that Captain Edwards admitted that, at the time of the collision, he had a duty to maintain a lookout, he left the wheelhouse of the *MLII* without a lookout, and the *MLII* moved away from the bank and into the center of the channel, where it collided with the *Capt Les*.

Captain Nichols opined that the collision was caused by Captain Edwards's failure to tie the *MLII* to the pilings and maintain a lookout or monitor the radio, which he asserted violated certain federal regulations. *See* 33 C.F.R. §§ 83.05,

10

83.17, 162.75 (2013). Nichols explained that the *Capt Les* had the right-of-way, Captain Walker's "actions were proper under the circumstances," neither Walker nor Five B's "had any fault in the collision," and the "sole cause of the collision" was the *MLII* coming off the bank. And Dr. Bindal testified that the collision caused Gay's injuries.

Captain Sutton opined that because it was "impossible" for the *MLII* to have made the turn Captain Walker described, it must have instead drifted out into the middle of the canal, where Walker should have seen it. Sutton did not dispute, however, that the *MLII* was in the center of the channel at the time of the collision. And he agreed that Captain Edwards should not have left the wheelhouse.

Augusta asserts that the trial court erred in impliedly not finding that Captain Walker's "violations of the Inland Navigational Rules," namely, his failure to sound a warning, "i.e., danger signal, general alarm, reversal of engines," was the proximate cause of Gay's injuries. Augusta argues that if Walker had "sounded the danger signal," Gay would not have been injured because his testimony reflects that he would have "immediately walked up to the pilothouse." And Walker's failure to "sound the required danger signal was a substantial, if not sole cause," of the collision and Gay's injuries.

Captain Walker testified that the *MLII* "all of the sudden . . . made a 90-degree turn right in front of the tow." He explained that he "threw the engines in

11

reverse" approximately "five seconds" before the lead barge hit the *MLII*. And Captain Nichols testified that even if Walker had sounded an alarm, it would not have changed the circumstances. From this evidence, the trial court could have reasonably found that Walker did not have an opportunity to sound a warning alarm prior to impact. *See Jackson*, 116 S.W.3d at 761.

We conclude that there is more than a scintilla of evidence to support the trial court's finding that Augusta was at least seventy-five percent at fault for the collision and damages to Gay. *See City of Keller*, 168 S.W.3d at 810. We further conclude that the evidence is not so weak as to make the trial court's findings clearly wrong or manifestly unjust. *See Francis*, 46 S.W.3d at 242.

Augusta further challenges the following trial court findings of fact:

5.  [Captain Walker] was piloting the *Capt Les* at the time of the collision. He was adequately rested and situationally aware during the relevant period of time. The *Capt Les* and her tow were under way in the waterway at a speed of 3–5 miles per hour.

. . . .

12.  When the *MLII* was approximately 80 feet off *Capt Les*'s starboard side, the *MLII* altered course and began running parallel with the *Capt Les*. In Walker's judgment, as well as that of Edwards, this was a safe distance. [Walker] decided to maintain the *Capt Les*'s course and speed.

13.  The *MLII* then increased speed and began overtaking and passing the *Capt Les*.

14.  Suddenly and without warning, the *MLII* changed course to port, crossing in front of the *Capt Les*. Walker took immediate

12

evasive action to avoid the collision. Nonetheless, the bow of the *Capt Les*'s forward barge contacted the *MLII*.

Augusta argues that the trial court's finding that Captain Walker was adequately rested and situationally aware is erroneous because it "was not supported by any evidence" and the "credible evidence" is "overwhelming" that he was, "at the time of the accident, sleep-deprived and physically fatigued," having worked "almost 24 hours a day for almost two days." Augusta asserts that federal law prohibits a crewman from working more than 12 hours in a 24-hour period and "[t]he logs of the *Capt Les* show that the vessel was working continuously from July 4th at approximately 11:00 a.m. when the vessel left Freeport, Texas, until approximately 5:30 a.m. on July 6th when the vessel collided with the [*MLII*]." *See* 46 U.S.C. § 804(a)

Captain Walker testified that he was the only licensed wheelman on board the *Capt Les* and Gay was relieving him for periods of rest. On the morning of the collision, Walker had been asleep for "at least six hours" before he came on watch at 5:30 a.m. The collision occurred at approximately 5:45 a.m., and it is undisputed that it occurred in the center of the channel. Augusta does not assert that Walker veered the *Capt Les* into the *MLII* at the bank.

Captain Nichols "did not find any evidence that [Captain] Walker did not have situational awareness" at the time of the incident. To the contrary, Nichols testified that Walker was aware, kept "a proper lookout," "saw the *MLII* from a

13

mile away," monitored it, and "continued to steer his tow in the proper manner." Nichols explained that when Walker saw the *MLII* coming toward his barge, he maneuvered to try to avoid a collision. And when the *MLII* began to go under the bow of the barge, Walker maneuvered to avoid hitting the wheelhouse and capsizing the *MLII*. We conclude that legally and factually sufficient evidence supports finding number 5.

In regard to its challenges of findings 12 through 14, "particularly the maneuvers of the *MLII*," Augusta asserts that the findings are "inconsistent with what a towboat without a pilot can do" and the "laws of nature and laws of physics clearly dictate that the trial court's findings were clearly erroneous." Specifically, Augusta asserts that the finding that the *MLII* was "unmanned during all relevant periods" is inconsistent with the finding that the vessel made a 90-degree turn into the barge and increased throttle. Augusta points to Captain Edwards's testimony that he left the *MLII* pushed into the bank and Captain Sutton's testimony that because the *MLII* had "only one rudder," it would be "locked in place and would not be able to move unless someone was actually manning the bridge and moving the steering arm."

The undisputed evidence, however, is that the collision occurred in the center of the channel, not at the bank, and some 300 yards away from the place where Captain Edwards stated he originally pushed the *MLII* into the bank. And

Captain Walker testified that a vessel with mechanical issues and a missing rudder can turn erratically in water currents. To the extent this presented a credibility dispute, the trial court could have chosen to believe Walker. *See Jackson*, 116 S.W.3d at 761. We conclude that the evidence is legally and factually sufficient to support findings 12 through 14.

Accordingly, we hold that the trial court's allocation of fault is supported by legally and factually sufficient evidence. *See City of Keller*, 168 S.W.3d at 810; *Francis*, 46 S.W.3d at 242; *see also Bass v. Phoenix Seadrill/78 Ltd.*, 749 F.2d 1154, 1166 (5th Cir. 1985) (concluding that even if subsidiary findings were clearly erroneous, sufficient evidence supported ultimate fault allocation).

We overrule Augusta's first issue.

### Maintenance and Cure

In its second issue, Augusta argues that the evidence is legally and factually insufficient to support the trial court's finding that Five B's is entitled to contribution for future maintenance and cure because Five B's presented "no evidence of future maintenance and cure, but only future medical payments." It asserts that the trial court "confused one of the damage elements of a Jones Act claim, namely, 'future medical expenses,' with the general maritime law doctrine of 'cure.'"

15

"Maintenance is a per diem living allowance paid so long as [a] seaman is outside the hospital and has not reached the point of 'maximum cure,'" while "[c]ure involves the payment of therapeutic, medical and hospital expenses not otherwise furnished to the seaman . . . ." *Prude v. W. Seafood Co.*, 769 S.W.2d 663, 664 (Tex. App.—Houston [14th Dist.] 1989, no writ). Maintenance and cure "extends during the period when [the seaman] is incapacitated to do a seaman's work and continues until he reaches maximum medical recovery." *Vaughan v. Atkinson*, 369 U.S. 527, 531, 82 S. Ct. 997, 1000 (1962). Maximum medical recovery, or maximum medical improvement ("MMI"), "is achieved when it appears probable that further treatment will result in no improvement of the seaman's condition." *Prude*, 769 S.W.2d at 664. Admiralty courts liberally interpret the duty to provide maintenance and cure "for the benefit and protection of seamen who are its wards." *Vaughan*, 369 U.S. at 531–32, 82 S. Ct. at 1000. Any ambiguity or doubt regarding a seaman's right to receive maintenance and cure is to be resolved in his favor. *Id.*

Here, Five B's settlement agreement with Gay, which was admitted into evidence, provides that Five B's paid Gay $90,000 for future maintenance and cure. Further, Dr. Bindal testified that Gay had not yet reached MMI, a second surgery might be necessary, and he would be in pain for the rest of his life. He opined that Gay would, based on reasonable medical probability, require medical

16

treatment in the future, namely, "doctor visits, pain medication, imaging studies, [and] possible therapy" at a cost of "$3,000 a year, each year, for the rest of his life." He anticipated that Gay would reach MMI, "hopefully, in the next six months" (from Bindal's October 2008 deposition). The trial court found the care prescribed by Bindal to be "necessary as a result of the subject collision and the costs projected by him to be reasonable." The trial court further found that there is "no evidence that Gay had reached MMI or that cure had been suspended."

Yeager testified that the present value of Gay's future medical costs would range from $90,000 to $186,164, depending on whether Gay needed a second surgery. He calculated future maintenance based on Dr. Bindal's estimate of $20.00 per day for six months, through April 2009, or $2,400. And he calculated "future medical expenses," again using Bindal's estimate of $3,000 per year for the expected duration of Gay's life, which he testified was 32.28 years, based on life expectancy tables. The trial court found Yeager's testimony, which was unrebutted, was credible and reliable, and it found that his testimony established the present value of cure pertaining to Gay. It concluded that Augusta was liable for seventy-five percent of the $90,000 that Five B's had paid to Gay for future maintenance and cure.

Augusta asserts that "while future medical expenses may include treatment or medicines to relieve pain, . . . it would not include treatment or medicines which

are merely palliative." In support of its argument, it relies on *Lewis v. Isthmian Lines, Inc.*, 425 S.W.2d 893, 895 (Tex. Civ. App.—Houston [14th Dist.] 1968, no writ). In *Lewis*, however, the court held that the seaman's right to recover cure ceased when he reached his maximum recovery or ceased to avail himself of curative treatment. *Id.* And *thereafter*, continuation of treatment does not continue the right to maintenance if that treatment is palliative, only, as distinguished from curative treatment. *Id.* Here, the trial court found that there was "no evidence that Gay had reached MMI or that cure had been suspended."

In regard to Augusta's assertion that the trial court "confused" future medical expenses with the general maritime law doctrine of cure, we note that cure "involves the payment of therapeutic, *medical and hospital expenses*." *Prude*, 769 S.W.2d at 664 (emphasis added).

Augusta further asserts that "Five B's may only seek to recover from Augusta maintenance and cure that it paid to or for Gay, its seaman." As noted, the Five B's settlement agreement with Gay, which was admitted into evidence, establishes that Five B's paid Gay $90,000 for future maintenance and cure.

In its reply brief, Augusta asserts for the first time that "an award of maintenance and cure in a lump sum to defray the costs of meeting both past needs and anticipated future needs based upon the seaman's life expectancy is not permissible." Generally, "[t]he award of a lump sum in anticipation of a

18

*continuing* need of maintenance and cure for life or an *indefinite* period is without support in judicial decision." *Calmar S.S. Corp. v. Taylor*, 303 U.S. 525, 530, 58 S. Ct. 651, 654 (1938) (emphasis added). In *Calmar*, the Supreme Court explained that

> [t]he seaman's recovery must . . . be measured in each case by the reasonable cost of that maintenance and cure to which he is entitled at the time of trial, including, in the discretion of the court, such amounts as may be needful in the immediate future for the maintenance and cure of a kind *and for a period which can be definitely ascertained.*

*Id.* at 531–32, 58 S. Ct. at 655 (emphasis added). For instance, "maintenance and cure is more certain if more limited in its benefits," "does not hold a ship to permanent liability for a pension," or "give a lump-sum payment to offset disability based on some conception of expectancy of life." *Farrell v. United States*, 336 U.S. 511, 519, 69 S. Ct. 707, 711 (1949).

Although lump sum awards for maintenance and cure are not ordinarily made, lump sum awards may be made if they are "limited and ascertainable." *Diamond Offshore Mgmt. Co. v. Cummings*, No. 01-08-00647-CV, 2010 WL 1611391, at \*6 (Tex. App.—Houston [1st Dist.] Apr. 22, 2010, pet. denied); *see Lirette v. K & B Boat Rentals, Inc.*, 579 F.2d 968, 969 (5th Cir. 1978) (concluding that judgment awarding future maintenance and cure to claimant "until he has reached maximum cure" did not contravene *Calmar*); *see also Pallis v. United States*, 369 F.App'x 538, 546 (5th Cir. 2010) (holding that trial court erred in

19

denying future maintenance because, having found that claimant would incur future medical expenses for physical therapy and knee replacement surgery, the court "implied a definite period of time for the completion of that treatment" under *Calmar* and progeny).

Here, the amount of Gay's maintenance and cure has already been decided by settlement. And the settlement agreement was admitted into evidence at trial. Thus, the amount of maintenance and cure at issue, $90,000, is "limited and ascertainable."

We conclude that legally and factually sufficient evidence supports the trial court's finding that Five B's paid Gay $90,000 to "settle the balance of his maintenance and cure." *See City of Keller*, 168 S.W.3d at 810; *Francis*, 46 S.W.3d at 242. We further conclude that legally sufficient evidence supports the trial court's conclusions that Five B's is entitled to contribution and "Augusta is responsible for 75 percent" of Gay's future maintenance and cure. *See Liberty Seafood, Inc.*, 38 F.3d at 757 (stating ship owner entitled to contribution for sums paid in maintenance and cure from third-party tortfeasor in proportion to third-party's fault); *Bertram*, 35 F.3d at 1015–16 (stating employer's right to recover maintenance and cure from tortfeasor not extinguished by settlement).

We overrule Augusta's second issue.

**Conclusion**

We affirm the judgment of the trial court.

Terry Jennings
Justice

Panel consists of Justices Jennings, Bland, and Massengale.